**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE:                                          )         **Chapter 7**
                                                )
**RESOURCE TECHNOLOGY**                          )
**CORPORATION,**                                 )         **Case No. 08 C 4235**
                                                )
                        **Debtor.**              )

## THE ESTATE'S RESPONSE TO THE EMERGENCY MOTION OF UNGARETTI & HARRIS, LLP TO STAY DISGORGEMENT PENDING RESOLUTION OF APPEAL

The Estate of Resource Technology Corporation (the "Estate"), by and through Jay A. Steinberg, not individually but solely in his capacity as Chapter 7 Trustee (the "Trustee") of the Estate, submits this Response to the Emergency Motion of Ungaretti & Harris, LLP ("Ungaretti") to Stay Disgorgement Pending Resolution of Appeal (the "Motion") as follows.

While the Estate does not dispute Ungaretti's recitation of the facts which led to the Motion, it is worth noting that the Motion has been necessitated solely by Ungaretti's failure to pay the disgorged amount of $376,235.54 by July 18, 2008 pursuant to Bankruptcy Court order.    Counsel for the Estate and counsel for Ungaretti communicated after that date had passed, and counsel for the Estate consented to hold off on filing a Motion for Rule to Show Cause against Ungaretti pending the filing of the Motion.

Under governing law there is no basis whatsoever for this Court to stay disgorgement pending the resolution of Ungaretti's appeal.  This Court should deny the Motion and require Ungaretti to disgorge the amount of $376,235.54 to the Chapter 7 Trustee for the benefit of the Estate immediately.

## **BACKGROUND**

In addition to the background which Ungaretti has set forth in the Motion, the Court should recall that the merits of Ungaretti's position have already been litigated before not only the Bankruptcy Court, but also this Court in a previous appeal.

On April 4, 2006, Ungaretti filed an adversary proceeding in the Bankruptcy Court against the Trustee and the Estate in which Ungaretti asserted (1) that it provided services to preserve the collateral of certain secured creditors while the case was proceeding in Chapter 11; (2) that it holds a claim of at least $1,500,000.00 for those services, recoverable under section 506(c) of the Bankruptcy Code; and (3) that it was entitled to payment of its 506(c) claim from funds that the Trustee obtained through an earlier settlement of claims asserted against the secured creditors. The Estate proposed a settlement with Ungaretti, and the secured creditors objected.

After briefing, on December 4, 2006, the Bankruptcy Court issued a Memorandum of Decision in which it denied a motion filed by the Estate to approve the settlement with Ungaretti (the "Settlement Motion"). In that opinion, this Court found that Ungaretti was unlikely to prevail on its complaint against the Trustee, and that the pending settlement – which included a waiver of the Estate's disgorgement claim against Ungaretti – was outside the range of reasonable litigation outcomes. See Memorandum of Decision, attached as Exhibit A.

Thereafter, the Trustee moved for judgment on the pleadings. The Bankruptcy Court granted that motion by Order dated January 18, 2007. See January 18, 2007 Order, attached as Exhibit B.

2

Ungaretti then filed a Notice of Appeal of both the order denying the settlement and the order granting judgment on the pleadings. The appeal was heard under case no. 07 C 1292, by this Court. During the briefing on the appeal, the Estate filed a Motion for an Order Directing Disgorgement of Fees (the "Disgorgement Motion") in the Bankruptcy Court. After it was briefed, the Disgorgement Motion was stayed pending the outcome of the appeal of the January 18, 2007 Order.

On March 5, 2008, this Court issued an opinion affirming the denial of the Settlement Motion and the granting the motion for judgment on the pleadings. See Memorandum Opinion and Order, attached as Exhibit C. That opinion analyzed, and rejected, three of Ungaretti's arguments: (1) that it should be allowed a section 506(c) surcharge; (2) that the court should impose a constructive trust; and (3) that quantum meruit provided a basis for recovery. In rejecting Ungaretti's request for a reversal of the Bankruptcy Court's denial of the settlement, this Court noted:

> The bankruptcy court's December 4, 2006 order indeed demonstrates a thorough command of the case and the trajectory of the adversary proceeding. The bankruptcy court also applied the correct legal standard – the best interests of the debtor's estate, measured by a comparison of the proposed settlement's terms with the likely costs of litigation and an assessment of whether it is within the 'reasonable range' of litigation outcomes, id. – in declining to approve the Steinberg-Ungaretti settlement. The Court cannot conclude that the bankruptcy court's denial of approval for the Steinberg-Ungaretti settlement amounted to an abuse of discretion.

(Exhibit C, at p. 21).

On June 17, 2008, upon the oral motion of the Estate, this Court granted the Disgorgement Motion and required Ungaretti to pay the $376,235.54 to the Estate on or before July 18, 2008 (the "Disgorgement Order"). See Disgorgement Order, attached as Exhibit D. Ungaretti filed its Notice of Appeal, and subsequently filed a motion to

stay in the Bankruptcy Court, a motion which is substantially similar to that now pending.  See Ungaretti's Motion to Stay Disgorgement filed in the Bankruptcy Court (exhibits omitted) (the "Bankruptcy Court Stay Motion"), attached as Exhibit E.  That motion was denied.  See docket entry denying Ungaretti's Bankruptcy Court Motion to Stay, attached as Exhibit F.

## ARGUMENT

It is clear that Ungaretti fails the test for obtaining a stay under Seventh Circuit law.  The Motion correctly cites the case of In re Forty-Eight Insulations, 115 F.3d 1294, 1300 (7th Cir. 1997) for the four factors a court must consider in determining whether to grant a stay pending appeal:  "(1) whether the appellant is likely to succeed on the merits of the appeal; (2) whether the appellant will suffer irreparable injury absent a stay; (3) whether a stay would substantially harm other parties in the litigation; and (4) whether a stay is in the public interest."  The movant has the burden of establishing each of these elements.  In re Doctors Hosp. of Hyde Park, 376 B.R. 242, 246 (Bankr. N.D. Ill. 2007). As set forth below, the analysis of these factors does not compel the grant of a stay.

### 1.    Ungaretti cannot show that it is likely to succeed on the merits of the appeal.

In the context of a stay pending appeal, "where the applicant's arguments have already been evaluated on the success scale, the applicant must make a stronger threshold showing of likelihood of success to meet his burden."  In re Forty-Eight, 115 F.3d at 1301.  In the In re Forty-Eight matter, the Seventh Circuit said that the showing must be "a substantial showing of likelihood of success."  This Seventh Circuit holding is

4

binding on this court, unlike the holding in the 1986 Thomas v. City of Evanston district court case which Ungaretti cites in the Motion.

Ungaretti simply cannot make the required showing. This Court has already affirmed the Bankruptcy Court's detailed analysis of Ungaretti's chances on the merits of its claim. See Exhibits A and C. In the Motion, Ungaretti makes two arguments: (1) that Section 726 of the Bankruptcy Code does not provide the authority to mandate disgorgement; and (2) that because some amount of the funds to be disgorged are costs, that the Court should treat them differently. The Bankruptcy Court rejected those arguments, and this Court should do so as well.

This Court should reject Ungaretti's section 726 argument for three reasons. First, Ungaretti has unsuccessfully argued to the Bankruptcy Court – twice - that section 726 of does not provide the authority to mandate disgorgement. See Exhibit E; see Ungaretti's Response to the Disgorgement Motion, attached as Exhibit G.    The Bankruptcy Court rejected that argument in granting the Disgorgement Motion, and rejected it again in denying the Bankruptcy Court Stay Motion.    Second, this Court considered the section 726 argument in its earlier affirmance in case 07 C 1292. (Exhibit C, at p. 15). Third, Ungaretti has not provided this Court with a single binding case which supports disgorgement.  Even the Anolik case, which Ungaretti quotes in bold and italics and which is the centerpiece of Ungaretti's argument, held "that ordering disgorgement of interim fees in either a Chapter 7 or 11 case is a discretionary matter." In re Anolik, 207 B.R. 34, 39 (Bankr. D. Mass. 1997).  Given the exhaustive analysis which both the Bankruptcy Court and this Court have made of the merits of Ungaretti's position, discretion is clearly on the side of disgorgement.

This Court should also reject Ungaretti's argument that it should not have to disgorge fees and costs as a matter of fairness, because (1) the appellate authority cited does not provide a basis for the relief requested; (2) the bankruptcy court cases cited are completely distinguishable; and (3) allowing Ungaretti to keep any of the amounts paid to it would impermissibly elevate the priority of Ungaretti's claim.

The only appellate case Ungaretti cites for the proposition that disgorgement of out of pocket costs creates a windfall for the estate, In re Kisseberth, 273 F.3d 714 (6th Cir. 2001), affirmed the bankruptcy order disgorging all fees and costs. Contrary to the Ungaretti's reading of the case, the Sixth Circuit did not "hold" that disgorgement of a transcript fee operates as a windfall to the bankruptcy estate. In Kisseberth, the debtors paid transcript costs pursuant to bankruptcy court order, with the understanding that they would receive reimbursement of those costs if an appeal of an insurance case was successful. Id. at 717. After the settlement of the insurance case, the debtors' attorney, Henderson, applied the proceeds of the successful appeal to his fees, not the costs. Id. The Sixth Circuit affirmed the district court's order requiring disgorgement by the attorney of the amount of the transcript cost because it was not properly part of the estate. Id. at 721-22. Thus, Kisseberth patently does not hold that disgorgement of a cost paid by an attorney is a windfall to the bankruptcy estate, as Ungaretti would have this Court believe.

The two bankruptcy court cases which Ungaretti cites, In re Diamond Mortgage and In re Midway Industrial Contractors, are also completely distinguishable from this case. In those cases, the courts learned, after the retention of the debtors' attorneys, that the attorneys were not disinterested as defined in the Bankruptcy Code. The

6

attorneys filed petitions for compensation, and the courts considering those petitions addressed the damage to the estate from the representation in deciding how to compensate the attorneys.  The payments at issue in these cases were not interim payments pursuant to section 331 of the Bankruptcy Code subject to disgorgement, as were the payments to Ungaretti.  Here, the Debtor's secured creditor made interim payments to Ungaretti in round amounts which do not appear to relate to any specific invoices of Ungaretti.  See Exhibit G.  The payments were not made in compliance with the Fee Procedures Order in the case or in accordance with section 331 of the Bankruptcy Code, and therefore were unauthorized.

Finally, Ungaretti's fees and costs are a Chapter 11 claim lower in priority than the Chapter 7 claims.  If Ungaretti does not have to disgorge, those fees and costs would be impermissibly elevated in priority.

## 2.    Ungaretti cannot show that it will suffer irreparable harm without the stay.

As In re Forty-Eight points out, this factor, as all four factors, mirrors the consideration of this factor in a ruling on a preliminary injunction.  In re Forty-Eight, 115 F.3d at 1300.  Thus, Ungaretti can only show irreparable harm if money damages are not an adequate remedy.  Ungaretti argues that the disgorged funds may be used for "Chapter 7 fees", but this argument has been rejected in this district.  As the court in In re Doctors Hospital noted, "an appeal being rendered moot does not itself constitute irreparable harm." In re Doctors Hospital, 376 B.R. at 248-49.

**3.    Ungaretti cannot show that a stay will not render substantial harm to other parties in the litigation.**

The Estate agrees that Ungaretti is a well-established, well-respected law firm. But the Estate has also had to expend substantial resources litigating the issue of recovery of Ungaretti funds.  Given all of the rulings in this case against Ungaretti, its continued efforts to fight disgorgement and the attendant efforts by the Estate to fight those efforts adversely impacts the Estate and its creditors.

**4.    The stay of the Disgorgement Order is not in the public interest.**

As noted in <u>In re Doctors Hospital</u>, the public policy behind bankruptcy is the equality of distribution to creditors within the priorities established by the Bankruptcy Code. <u>Id.</u> at 249.  Longstanding litigation and the delays attendant to that litigation are contrary to the public interest. <u>Id.</u>

## CONCLUSION

For the reasons set forth above, this Court should deny the Motion and require Ungaretti to disgorge the amount of $376,235.54 to the Chapter 7 Trustee for the benefit of the Estate immediately pending the outcome of this appeal.

THE CHAPTER 7 ESTATE OF RESOURCE
TECHNOLOGY CORPORATION, BY AND
THROUGH JAY A. STEINBERG, NOT
INDIVIDUALLY BUT SOLELY IN HIS
CAPACITY AS CHAPTER 7 TRUSTEE

By:_____ /s/ George P. Apostolides_____

Barry A. Chatz
George P. Apostolides
Arnstein & Lehr LLP
120 S. Riverside Plaza, Suite 1200
Chicago, IL  60606
(312) 876-7100
Fax: (312) 876-0288

8

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RESOURCE TECHNOLOGY | ) | **Chapter 7** |
| CORPORATION, | ) | |
| | ) | **Case No. 99 B 35434** |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| UNGARETTI & HARRIS, LLP, | ) | |
| | ) | |
| Plaintiff, | ) | **Adversary Proceeding No.** |
| v. | ) | **06 A 00907** |
| | ) | |
| JAY A. STEINBERG, not individually but | ) | |
| solely as Chapter 7 Trustee for RESOURCE | ) | |
| TECHNOLOGY CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court on the defendant's motion for approval of

a settlement.  The defendant, Jay Steinberg, is the Chapter 7 trustee of debtor Resource

Technology Corporation ("RTC"). The plaintiff, Ungaretti & Harris, LLP ("U&H") was

counsel to RTC's former Chapter 11 trustee, Gregg Szilagyi.  U&H asserts in its complaint (1)

that it provided services to preserve the collateral of certain secured creditors while the case

was proceeding in Chapter 11, (2) that it holds a claim of at least $1.5 million for these

services, recoverable under § 506(c) of the Bankruptcy Code (Title 11, U.S.C.), and (3) that it

is entitled to payment of this § 506(c) claim from funds that Steinberg obtained through an

earlier settlement of claims that RTC had asserted against the secured creditors.  In addition,

U&H and Szilagyi have asserted substantial administrative claims for the services they rendered to the RTC estate.

Steinberg now proposes a settlement with U&H and Szilagyi that would, among other things, provide U&H with a cash payment of $253,190, waive a claim of the estate for disgorgement of fees that U&H has already received, provide U&H with an allowed Chapter 11 administrative claim of $1,857,270, and provide Szilagyi with an allowed Chapter 11 administrative claim of $250,000.

As discussed below, U&H is unlikely to prevail on its complaint, both because U&H was not given an allowance under § 506(c) on motion of a trustee, and—more fundamentally—because any claim under § 506(c) could only be payable to the RTC estate, not to U&H. Thus, whatever claims U&H has against the RTC estate are only payable as Chapter 11 administrative claims, subordinated to the costs of administration of the case in Chapter 7 and payable pro rata with other Chapter 11 administrative claims. The assets in RTC's estate are not likely to allow payment of Chapter 11 administrative claims in full, and so the payment to U&H and the waiver of the estate's disgorgement claim proposed by the pending settlement are outside the range of reasonable litigation outcomes in this proceeding. Moreover, the proposed allowance of administrative claims for professional fees without judicial review is improper. Accordingly, the motion to approve the settlement will be denied.

### Jurisdiction

District courts have exclusive jurisdiction over bankruptcy cases, pursuant to 28 U.S.C. § 1334(a), and they have concurrent jurisdiction over all civil proceedings "arising under" the Bankruptcy Code, pursuant to 28 U.S.C. § 1334(b). The pending settlement motion involves the allowance of claims against the estate and approval of the use of estate property, both matters that "arise under" the Code (§§ 502(b) and 363(b)) and so are within the district

court's jurisdiction. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987)

("Congress used the phrase 'arising under title 11' to describe those proceedings that involve a

cause of action created or determined by a statutory provision of title 11.")

Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the

District Court for the Northern District of Illinois has referred its bankruptcy cases to the

bankruptcy court of this district. When presiding over a referred case, the bankruptcy court

has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core

proceedings within the case. The settlement motion is a core proceeding under 28 U.S.C.

§ 157(b)(2)(B) (allowance or disallowance of claims against the estate) and (M) (orders

approving use of property), and so may be finally decided by this court. *See In re Telesphere

Communications, Inc.*, 179 B.R. 544, 546 (Bankr. N.D. Ill. 1994) (finding core jurisdiction

over a motion to approve the settlement of a claim asserted by the estate).

### Background

*The RTC bankruptcy case.*

Resource Technology Corporation ("RTC"), the debtor in this bankruptcy case, is a

corporation in the business of removing methane gas from landfills and, where possible, selling

the gas or converting it to usable energy. In November 1999, RTC was subject to an

involuntary bankruptcy proceeding; it consented to entry of an order for relief in January

2000.

RTC's principal secured creditors, at all relevant times, have been a group including

Leon Greenblatt, Banco Panamericano, Chiplease, Inc., and other related entities (collectively

"the Lenders"). The Lenders include controlling persons of RTC and provided RTC's debtor

in possession financing, secured by a lien on nearly all of its assets.

3

RTC operated as a debtor in possession until August 2003. At that point, problems with its management, including unauthorized payments to professionals and failures to file timely operating reports, led to Szilagyi's appointment as the Chapter 11 trustee. Szilagyi administered the RTC estate for about 2 years.

As part of his administration of the RTC estate in Chapter 11, Szilagyi, represented by U&H, took action to preserve estate assets (the Lenders' collateral) from legal challenges by other entities, but he also took action against the Lenders themselves. This included filing the following adversary complaints against Lenders' entities:

• *Szilagyi v. Greenblatt et al.*, No. 04 A 3867, filed October 22, 2004, alleged that the Lenders converted a payment of $145,000 from Commonwealth Edison Company to RTC.

• *Szilagyi v. Greenblatt et al.*, No. 04 A 4068, filed November 16, 2004, sought to enjoin the lenders from taking any action to enforce their liens against property of the estate.

• *Szilagyi v. Loop Corp. et al.*, No. 05 A 0025, filed January 10, 2005, sought judgment against entities controlled by the Lenders in the amount of $1,589,250 for unauthorized transfers of estate property.

In September 2005, the case was converted to Chapter 7, and Jay Steinberg was appointed trustee. Steinberg initially continued the business operations of RTC, but ceased doing so in March 2006. He has since been engaged in liquidating the estate assets.
*Background of the pending settlement.*

The settlement agreement now under consideration would resolve two major outstanding disputes involving the RTC estate. One of these disputes involves the services rendered by Szilagyi and U&H. For his services as Chapter 11 trustee, Szilagyi has filed a final application for allowance of a Chapter 11 administrative claim in the amount of $678,317.30. (Bankruptcy Docket No. 3001.) U&H has filed a final application seeking allowance of a Chapter 11 administrative expense of $1,953,402.50 in legal fees and

4

support of the Szilagyi/Lender Settlement, also adopted this view. In response, Szilagyi decided before the hearing ended to withdraw his request for approval of the settlement and to proceed simply on his request for dismissal of the bankruptcy case. (See Transcript of September 20, 2005, Ex. B to Motion of the Chapter 7 Trustee, Bankruptcy Docket No. 2863, at 9-10.)

At the hearing, a need for further bankruptcy administration was shown, including U&H's receipt of $376,235.54 from the RTC estate without court authorization.[1] On September 21, 2005, the court entered an order denying Szilagyi's motion "to the extent not withdrawn." (Bankruptcy Docket No. 2566.) At the same time, the court entered an order converting the case to Chapter 7. (Bankruptcy Docket No. 2567.) Jay Steinberg was appointed Chapter 7 trustee.

Thereafter, U&H voluntarily transferred the Lender Funds to counsel for Steinberg, to be held in escrow pending subsequent court order. U&H did not, however, give up its claim to the Lender Funds: U&H, the Lenders, and Steinberg (on behalf of RTC's Chapter 7 estate), all continued to assert a right to the funds.

On December 15, 2005, Steinberg sought to terminate the Lenders' claim to the Lender Funds through a new motion to approve the Szilagyi/Lender Settlement. (Bankruptcy Docket No. 2863.) Steinberg argued that Szilagyi had done all that was required of him under

---

[1] U&H's employment by Szilagyi was approved on August 28, 2003, with compensation subject to further court order. (Bankruptcy Docket No. 1811.) An order of September 18, 2003 (Bankruptcy Docket No. 1830) allowed U&H to seek interim compensation by presenting a monthly statement to specified parties, and then receiving 80% of the stated fees and 100% of the stated expenses from the debtor if there were no objections to the monthly statement. Any such payments, however, were "subject to the court's subsequent approval as part of the normal interim fee application process approximately every 120 days." U&H received payments from RTC during the period November 2003 to May 2005 on a roughly monthly basis, but U&H did not file an application for allowance of interim compensation until September 2, 2005, in connection with its motion to dismiss the bankruptcy case. (Bankruptcy Docket No. 2540.) Because U&H thus did not engage in the "normal interim fee application process" required by the September 18, 2003 order, the payments it received were unauthorized.

$215,181.31 in costs. (Bankruptcy Docket No. 3002.) The Lenders have objected to both applications.

The other dispute that the settlement would resolve is a set of competing claims to a $1.5 million payment that the Lenders made during Szilagyi's administration of the case (the "Lender Funds"). Two earlier settlements of disputes between the RTC estate and the Lenders—one negotiated by Szilagyi and one by Steinberg—provide the background for the dispute over the Lender Funds.

*The Szilagyi/Lender Settlement.* During his administration of the RTC estate, Szilagyi entered into a settlement with the Lenders dated June 22, 2005 (the "Szilagyi/Lender Settlement," Bankruptcy Docket No. 2463, Ex. A). This settlement provided that Szilagyi would (1) pursue a motion to dismiss the RTC bankruptcy case, (2) suspend any action affecting the Lenders' collateral pending a ruling on the motion to dismiss, (3) seek dismissal of his injunctive proceeding against the Lenders' lien enforcement activities, and (4) file a timely notice of appeal with respect to an order entered against RTC in an adversary proceeding brought by the Connecticut Resource Recovery Authority. In return, the Lenders agreed to pay $2 million in satisfaction of claims that U&H asserted under § 506(c) of the Bankruptcy Code for preserving the Lenders' collateral. The Lenders paid U&H $1.5 million of this amount—the Lender Funds—when the Szilagyi/Lender Settlement was executed, even though the settlement would not become effective unless approved by the court.

On June 24, 2005, Szilagyi filed a motion both to approve the settlement and to dismiss the case. The motion generated objections from creditors other than the Lenders, and a hearing on the motion was held on September 19 and 20, 2005. During the hearing, the court expressed the view that any recovery on the § 506(c) claim asserted by Szilagyi and U&H would belong to the RTC estate, so that the provision of the settlement calling for payment directly to U&H could not be approved; the United States trustee, reversing his original

5

the agreement and that the agreement would be enforceable upon the court's approval. Critically, the motion contended that Steinberg, as Szilagyi's successor, would obtain the benefits of the settlement (including the Lender Funds) for RTC's Chapter 7 estate: "The Court's approval of the [Szilagyi/Lender] Settlement would make at least $1.0 million immediately available to fund the Chapter 7 cost of administration." (Motion at 8.) Accordingly, Steinberg sought an order "finding that the Chapter 7 Estate is entitled" to the Lender Funds. (*Id.* at 9-10.) On December 28, 2005, the court granted Steinberg's motion. However, on January 3, 2006, the Lenders filed a timely motion pursuant to Fed. R. Bankr. P. 9023 (incorporating Fed. R. Civ. P. 59) to vacate approval of the settlement. (Bankruptcy Docket No. 2927.) The arguments made by the Lenders were substantial, and the court took the motion under advisement.[2] At this time, then, the enforceability of the Szilagyi/Lender Settlement and the disposition of the Lender Funds were still unresolved.

*The Steinberg/Lender Settlement.* Before the court ruled on the Lenders' motion for reconsideration, Steinberg reached a new, global agreement with the Lenders, outlined in a motion to approve the settlement filed on February 17, 2006. (Bankruptcy Docket No. 3091.) The settlement itself (the "Steinberg/Lender Settlement") was filed a week later. (Bankruptcy Docket No. 3101.) The settlement required one of the Lenders' entities to pay all unpaid Chapter 7 operating expenses above $150,000 and to pay the estate (a) an additional $275,000

---

[2] Among its other arguments, the motion

(1) pointed out a provision of the Szilagyi/Lender Settlement requiring that "[i]f the RTC bankruptcy case is not dismissed or any dismissal order entered by the bankruptcy court is reversed on appeal, then the Trustee . . . shall not be entitled to any further payments for professional fees or Trustee's fees from the RTC estate until and unless the sums advanced by the Lenders pursuant to this agreement are repaid to the Lenders by RTC in full,"

(2) noted that Steinberg had already sought and received payment of professional fees without RTC's repayment of the Lender Funds, and

(3) argued that this breach by Steinberg rendered the settlement incapable of being approved. (Motion at 6.)

7

in cash, (b) 20% of any recovery on any cause of action of the RTC estate conveyed under the agreement, and (c) 20% of any recovery obtained through the prosecution of a pending complaint proceeding brought in the Lenders' own right. (Steinberg/Lender Settlement at ¶ 11(i), (iv), (v).) In addition, it provided that Steinberg would receive the Lender Funds on behalf of the RTC estate, with the Lenders waiving any claim to those funds. (*Id.* at ¶ 11(iii).) The Lenders also agreed to forego any Chapter 7 administrative claims, although they retained other claims, both secured and administrative, against the estate. (*Id.* at ¶ 11(vii), (viii).)

In return, the settlement provided the Lenders with two major items of consideration. The first was the right to obtain assets of the estate, including certain causes of action and the right to designate entities to which Steinberg would seek to assign RTC's unexpired leases and executory contracts. (*Id.* at ¶¶ 4-6.) The second item of consideration was a release of the RTC estate's claims against the Lenders. (*Id.* at ¶¶ 9-10.) These included claims for equitable subordination and treble RICO damages that Steinberg had asserted in *The Chapter 7 Bankruptcy Estate of Resource Technology Corp. v. Greenblatt et al.*, 05 A 02521, filed October 27, 2005. The release also removed any liability that the Lenders had to the RTC estate for preservation of their collateral under § 506(c) of the Bankruptcy Code.

On March 16, 2006, the court approved the Steinberg/Lender Settlement (Bankruptcy Docket No. 3170) and the Lenders' motion to vacate the court's approval of the earlier settlement was withdrawn as moot (Bankruptcy Docket No. 3182). Pursuant to the Steinberg/Lender Settlement, the court entered an order on March 28 authorizing Steinberg's counsel "to distribute $1.5 million of the funds held in escrow relating to the Settlement Agreement to Steinberg for the benefit of the Estate." (Bankruptcy Docket No. 3201.)

Steinberg's settlement with the Lenders, however, did not resolve U&H's claims. On April 4, 2006, U&H filed the present adversary proceeding, seeking injunctive relief and turnover of the Lender Funds. U&H asserted three grounds for claiming the funds: (1) as the

8

entity whose services provided the basis for the § 506(c) claim treated by the Szilagyi/Lender Settlement, U&H is entitled to payment of the Lender Funds as a § 506(c) recovery; (2) U&H is entitled to the imposition of a constructive trust on the Lender Funds for unpaid trustee fees and attorneys' fees incurred in the course of administering the case in Chapter 11; and (3) Szilagyi and U & H have a claim in quantum meruit that should be paid out of the Lender Funds. Along with its adversary complaint, U&H filed a motion for preliminary injunction to prevent Steinberg from expending the Lender Funds.

*The pending settlement.*

Once again, before any ruling on the motion for preliminary injunction or the pending fee applications of Szilagyi and U&H, Steinberg proposed a global settlement, the subject of the motion now before the court. The terms of this agreement (the "Steinberg/U & H Settlement") are set out in the motion. (Adversary Docket No. 26.) Under the agreement, U&H and Szilagyi would waive both their claims to the Lender Funds and any other claims not set out in the agreement. In exchange, the RTC estate would provide the following consideration:

1. Payment of $253,190.22 to U&H, of which $217,373.72 is attributed to expenses incurred while assisting Szilagyi in Chapter 11 administration and $35,816.50 is attributed to "transition services" rendered to assist Steinberg in Chapter 7 administration.

2. An allowed Chapter 11 administrative claim for U&H in the amount of $1,857,270.

3. Waiver of the estate's claim for disgorgement by U&H of the $376,235.54 that U&H received from the estate during Szilagyi's administration, in that U&H would be allowed to credit this amount against its allowed Chapter 11 administrative claim.

4. An allowed Chapter 11 administrative claim for Szilagyi in the amount of $250,000. The Lenders have opposed the motion to approve the Steinberg/U&H Settlement.

*The present condition of the RTC estate.*

9

At the court's direction, Steinberg reported the extent of the assets of the RTC estate and the outstanding administrative claims against it. (Bankruptcy Docket No. 3637.) His report reflects that as of October 23, 2006, the RTC estate consisted only of (1) $608,426 in cash and (2) the right accorded by the Steinberg/Lender Settlement to share in the proceeds of litigation assigned to or brought by the Lenders. (*Id.* at ¶¶ 16-17.) The report estimates that professional fees in the Chapter 7 case, for which the Lenders are not responsible, will total approximately $600,000. (*Id.* at ¶ 18.) Paying the Chapter 7 professional fees would exhaust the estate's cash supply, leaving the estate with no current funds to pay administrative claims that arose during Chapter 11 administration. The report states that pending Chapter 11 administrative claims total approximately $87 million. (*Id.* at ¶ 23.)

## Conclusions of Law

The Steinberg/U&H Settlement raises two distinct problems that prevent court approval: first, its cash payment to U&H is outside the range of reasonable litigation outcomes, and second, its allowance of administrative claims to Szilagyi and U&H bypasses the court's obligation to review fee applications independently.

*A. The cash payment.*

U&H's adversary complaint asserts a claim to the Lender Funds, an asset that the RTC estate now holds; U&H has also asserted what would be a Chapter 7 administrative claim for "transition services." At the same time, the estate has a claim for disgorgement of fees from U&H. In the ordinary course, these conflicting claims would be adjudicated on the merits by the bankruptcy court. The Steinberg/U&H Settlement proposes a resolution of the claims outside the ordinary course, waiving the estate's claim to disgorgement and paying cash from the estate to U&H.

10

Such a use of estate property outside the ordinary course requires court approval under § 363(b) of the Bankruptcy Code, and the proposed use should be approved only if it is in the best interest of the estate. *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994). As applied to a proposed settlement, this "best interest" determination requires the court to "estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled." *Id.* at 553. Based on that estimate, the court must determine "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *In re Energy Co-Op., Inc.*, 886 F.2d 921, 929 (7th Cir. 1989). The court should disapprove the settlement "only if it falls below the lowest point in the range of reasonableness." *Id.*

The likely outcome of litigating the conflicting claims of U&H and the RTC estate is that the estate, not U&H, would receive a net recovery.

1. *The estate's disgorgement claim.* The estate would very likely succeed in its claim for disgorgement. The payments that U&H received from the estate during Szilagyi's Chapter 11 administration were, as noted above, made without court authorization. Thus, regardless of whether U&H would have been entitled to the payments upon proper application, the payments are subject to avoidance under § 549(a)(2)(B) of the Code (allowing the trustee to avoid any postpetition transfers of estate property not authorized by the court). *In re Powers*, 93 B.R. 513, 516 (Bankr. S.D. Tex. 1988).

More fundamentally, even if the payments had been authorized, they would be subject to disgorgement in view of the present inability of the RTC estate to pay all of its Chapter 11 administrative expenses. U&H is only one among several entities that provided goods or services to the RTC estate during its administration in Chapter 11; their resulting administrative claims amount to some $87 million. Each of these administrative creditors is entitled to a pro rata distribution of the estate under § 726(b) of the Code. At the same time,

11

§ 726(b) expressly provides that administrative claims incurred in a Chapter 11 case before conversion to Chapter 7 are subordinated to the expenses of administering the case in Chapter 7 after conversion. *CIT Communications Finance Corp., v. Midway Airlines Corp.*, 406 F.3d 229, 241 (4th Cir. 2005). The Chapter 7 administrative expenses are expected to exhaust all of the cash that the estate currently possesses. A Chapter 11 administrative creditor who has been paid interim compensation under § 331—the procedure that U&H was required to follow to obtain authorization in this case—is required to disgorge the payments if there are insufficient estate assets to pay all of the other Chapter 11 administrative creditors in full. *Specker Motor Sales Co. v. Eisen*, 393 F.3d 659, 664-65 (6th Cir. 2004) ("[I]nterim compensation must be disgorged when necessary to achieve *pro rata* distribution of a Chapter 7 bankruptcy estate."). Thus, in a litigated resolution of its claim for disgorgement, the RTC estate would very likely be awarded the entire $376,235.54 that U&H has already received for its services during Chapter 11 administration.

       2. *U&H's claim to the Lender Funds.* In contrast, U&H is unlikely to prevail on its claim to the Lender Funds. None of the three grounds set out in U&H's complaint to establish a right to these funds has any likelihood of success.

       a. *Section 506(c).* U&H's primary argument for entitlement to the Lender Funds is that these funds were a § 506(c) surcharge against the Lenders' collateral. Section 506(c) provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." Because a § 506(c) recovery is charged against collateral held by a secured creditor, it is generally referred to as a "§ 506(c) surcharge." U&H argues that the entire $1.5 million in Lender Funds was a § 506(c) surcharge and that U&H is entitled to receive it, as the party that provided services preserving the Lenders' collateral.

This argument is likely to fail for two reasons. First, the Lender Funds were not awarded to U&H pursuant to a request by a bankruptcy trustee. The Supreme Court has interpreted § 506(c) as allowing a surcharge against collateral only at the instance of a trustee. *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 9 (2000) ("[B]y far the most natural reading of § 506(c) is that it extends only to the trustee . . . .").[3] Szilagyi, as Chapter 11 trustee, sought to obtain a § 506(c) surcharge on behalf of U&H in his motion for approval of the Szilagyi/Lender Settlement, but he withdrew that request after the court indicated it would not be granted. Steinberg, as Chapter 7 trustee, also sought approval of the Szilagyi/Lender Settlement, but with the express condition that the § 506(c) surcharge would be payable to the Chapter 7 estate, not U&H. The court granted Steinberg's motion on that basis. In the end, though, payment of the Lender Funds was approved under the Steinberg/Lender Settlement, with no specific amount attributed to a § 506(c) surcharge. Thus, the court never granted a request by a trustee for payment of the Lender Funds to U&H as a § 506(c) surcharge, and so, under *Hartford Underwriters*, U&H has no claim to the Lender Funds under § 506(c).

Second—although *Hartford Underwriters*, 530 U.S. at 11 n.4, expressly declined to rule on the question—a § 506(c) recovery by a trustee cannot properly be paid to an individual administrative creditor like U&H. Rather, because only a bankruptcy trustee may seek a § 506(c) surcharge, the surcharge can only be recovered for the benefit of the bankruptcy estate. Section 323(a) of the Code defines the role of a bankruptcy trustee as "the representative of the estate"; the trustee has the duty to administer estate property—to "collect and reduce to money the property of the estate" in Chapter 7, pursuant to § 704(a)(4),

---

[3] The Supreme Court has recognized that a Chapter 11 debtor in possession exercises the powers of a trustee pursuant to §1107(a), including the power to seek §506(c) surcharges. *Hartford Underwriters*, 530 U.S. at 6 n.3.

13

and to operate the estate's business in Chapter 11, pursuant to § 1108. But the Code grants

the trustee no power to pursue claims on behalf of individual creditors against third parties.

*Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1347 n.11 (7th Cir. 1987).

Thus, by specifying that only the trustee may surcharge a secured creditor's collateral for the

costs and expenses of preserving or disposing of it, "[t]he plain language of § 506(c) compels

the conclusion that 'a section 506(c) recovery is for the benefit of the estate.'" *In re Ben*

*Franklin Retail Store, Inc.*, 210 B.R. 315, 317 (Bankr. N.D. Ill. 1997) (quoting *Collier on*

*Bankruptcy* ¶ 506.04 (Lawrence P. King ed., 15th ed. rev. 1996)).[4]

---

[4]The most recent edition of *Collier* changes its position, citing *Debbie Reynolds Hotel*
*& Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061
(9th Cir. 2001), for the proposition that "in any instance in which a trustee has incurred an
expense on credit to preserve or dispose of a secured creditor's collateral, and the expense
remains unpaid . . . , any recovery under section 506(c) by the trustee . . . on account of the
unpaid claim properly belongs to the third party whose provision of goods or services provided
the benefit." 6 *Collier on Bankruptcy* ¶ 506.05[1] (Alan N. Resnick & Henry J. Sommer eds.,
15th ed. rev. 2006). One other decision rendered after *Hartford Underwriters*—*In re Nuclear*
*Imaging Systems, Inc.*, 270 B.R. 365 (Bankr. E.D. Pa. 2001)—also approves payment directly
from a secured creditor to an entity that provided services benefiting its collateral. However,
neither *Debbie Reynolds* nor *Nuclear Imaging* presents a convincing rationale for reading
§506(c) as a vehicle for recovery by a trustee for the benefit of an individual creditor.

*Debbie Reynolds*, 255 F.3d at 1067, simply relies on a statement in an earlier Ninth
Circuit decision that a recovery by a trustee under §506(c) "would pass to the claimant with
no gain to the estate." *In re Palomar Truck Corp.*, 951 F.2d 229, 232 (9th Cir. 1991).
*Palomar*, though, provides no support or explanation for this statement, and its main
holding—that an individual creditor may pursue a §506(c) surcharge—was overruled by
*Hartford Underwriters*. Moreover, *Debbie Reynolds* is plainly mistaken in asserting that if a
trustee "paid its counsel's legal fees prior to seeking a surcharge, the effect would be the same
as if the proceeds from the surcharge were distributed directly to . . . counsel." *Debbie*
*Reynolds*, 255 F.3d at 1067. As noted above, if a bankruptcy professional receives interim
compensation in a case that later becomes administratively insolvent, the interim fees are
subject to disgorgement so that all administrative creditors are paid according to the Code's
priorities. Direct payment of a surcharge recovered by the trustee to a particular
administrative creditor would allow a major deviation from these priorities.

Unlike *Debbie Reynolds*, *Nuclear Imaging* does provide a rationale for approving a
direct payment from a secured creditor to an administrative claimant who contributed to the
preservation of the creditor's collateral. But the rationale—express consent of the secured
creditor—is inconsistent with the Ninth Circuit's position that a trustee's recovery under
§ 506(c) may be paid to an individual creditor. Rather, *Nuclear Imaging* cites Fourth Circuit

14

The "plain meaning" application of § 506(c)—recovery payable only to the estate—is particularly compelling where, as here, the estate is administratively insolvent and the trustee or the trustee's attorneys contend that they provided services generating the right to a § 506(c) surcharge. In this situation, if the surcharge were payable to them, the trustee and counsel would be faced with a major conflict of interest. They would then be able to pursue—and attempt to settle for cash—a personal surcharge claim against the secured creditor to the detriment of claims that they might pursue on behalf of other creditors or the estate, such as § 506(c) claims based on goods or services provided by others or estate claims for avoidance of liens or equitable subordination. Recovering a surcharge for another creditor or pursuing a claim on behalf of the insolvent estate has much less potential benefit for the trustee and trustee's counsel than a payment made directly to them. Thus, trustee and counsel would have a powerful incentive to agree with a secured creditor that the other (creditor and estate) claims be released in exchange for a § 506(c) surcharge paid directly to them.

---

precedent for the rule that a trustee cannot obtain a § 506(c) surcharge unless (1) the estate has already expended funds to preserve or dispose of collateral subject to surcharge, or (2) the trustee at least "can demonstrate that the expense would later [be] repaid in full from estate funds." *Nuclear Imaging,* 270 B.R. at 379-80 & 380 n.11 ) (citing *In re K & L Lakeland, Inc.,* 128 F.3d 203, 207, 212 (4th Cir. 1997)). Where the estate has not yet paid an expense of preservation or disposition and cannot assure that it will pay that expense in full, *Nuclear Imaging* suggests the trustee has no right to § 506(c) surcharge and that any payment by the secured creditor can only be the result of a voluntary agreement—a "carve out" from the collateral proceeds. In other words, *Nuclear Imaging* holds that in the absence of full payment of a collateral-related expense by the estate, the collateral proceeds are "payable to the secured creditor but for its consent to transfer property to a particular administrative claimant." *Id.* at 379. This is a minority view, adopted by only one of the three judges who decided *K & L Lakeland. See* 128 F.3d at 211 (Phillips, J., concurring in part) and 212 (Hamilton, J., concurring in part and dissenting in part). But regardless of its conclusion as to the circumstances under which a trustee may seek a §506(c) surcharge, *Nuclear Imaging* is fully consistent with the Fourth Circuit's position—contrary to *Debbie Reynolds*—that where the trustee is entitled to a §506(c) surcharge, the surcharge is payable to the estate, "as an unencumbered asset for distribution to the unsecured creditors . . . . [p]ursuant to the distribution rules of §726(a) [and] the priority rules of . . . § 507." *In re JKJ Chevrolet, Inc.,* 26 F.3d 481, 484 (4th Cir. 1994).

Indeed, this case presents just such a situation. Szilagyi and U&H (the law firm of which he was a member) agreed to seek dismissal of the bankruptcy case—waiving all of the other claims they had asserted or could have asserted against the Lenders—as part of an agreement that promised a § 506(c) surcharge of $2 million paid directly to U&H. This agreement may have been negotiated in complete good faith—the court has made no finding to the contrary—but it gave Szilagyi and U&H an interest (in their personal claim to a § 506(c) surcharge) at odds with the interests of other creditors (in claims that would benefit the estate generally).[5]

The Bankruptcy Code takes great care to assure that trustees and their counsel do not hold interests adverse to the estate. *See* §§ 101(14)(E) (a "disinterested person" may "not have an interest materially adverse to the interest of the estate or any class of creditors"), 327(a) (professionals employed by a trustee must be disinterested persons), 328(c) (compensation may be denied to any professional employed under § 327 if at any time during employment the professional is not disinterested), 701(a)(1) (Chapter 7 trustees must be disinterested), 1104(b) (Chapter 11 trustees must be disinterested). The plain meaning of § 506(c)—that recoveries by the trustee benefit the estate—is consistent with this pervasive policy of disinterestedness: trustee and counsel have no more incentive to pursue § 506(c) claims based on their own services than they do to pursue any other claim for the benefit of the estate. But

---

[5] A similar conflict may have been present in the *Debbie Reynolds* case, discussed at n.4, above. There, counsel for the debtor in possession was allowed to collect a §506(c) surcharge of $50,000 as part of an agreement that foreclosed any other §506(c) surcharges, including a $150,000 claim by another administrative creditor. *Debbie Reynolds*, 255 F.3d at 1064.

16

a reading of § 506(c) that gives the trustee and the trustee's professionals a personal recovery substantially undermines the policy.[6]

Accordingly, U&H likely has no claim to the Lender Funds as a § 506(c) surcharge.

b. *Constructive trust.* U&H's second basis for claiming an interest in the Lender Funds is constructive trust. Under Illinois law, such a trust arises when "a court declares the party in possession of wrongfully acquired property as the constructive trustee of that property." *Suttles v. Vogel,* 126 Ill. 2d 186, 193-94, 533 N.E.2d 901, 904-05 (1988) (dismissing a complaint seeking a constructive trust because it failed to allege "actual or constructive fraud, duress, coercion or mistake"). It may be that a trustee who wrongfully acquired title to property on behalf of the bankruptcy estate could be declared, under state law, the constructive trustee of the property for the benefit of the former titleholder, although U&H has cited no decisions so holding. *See* 28 U.S.C. § 959(b) (a bankruptcy trustee "shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated.")[7]

Here, the only wrong U&H asserts is that the Lender Funds are a "windfall" to RTC's estate in Chapter 7 because the funds were generated through the actions of Szilagyi and U&H, rather than Steinberg and his counsel. This argument is incorrect; Steinberg's actions

---

[6] *See also* David Gray Carlson, *Surcharge and Standing: Bankruptcy Code Section 506(c) After Hartford Underwriters,* 76 Am. Bankr. L.J. 43, 62-69 (2002) (outlining additional arguments in favor of the estate's ownership of §506(c) surcharges).

[7] The decisions U&H cites are ones in which a debtor is alleged to have obtained property wrongfully before the bankruptcy filing, and a claimant to the property asserts a constructive trust so as to remove the property from the bankruptcy estate. *See, e.g., In re Fieldcrest Homes, Inc.,* 18 B.R. 678 (Bankr. N.D. Ill. 1982) (discussing a complaint brought by an escrow beneficiary for imposition of a constructive trust on funds allegedly diverted by the debtor in violation of the escrow agreement before the bankruptcy filing). Such constructive fraud claims have been called into question by *In re Omegas Group, Inc.,* 16 F.3d 1443, 1451 (6th Cir. 1994) (entitlement to a constructive trust, not actually imposed before the bankruptcy filing, does not remove property from a bankruptcy estate).

17

were instrumental in obtaining the Lender Funds for the RTC estate.[8]  More importantly,

U&H's argument misses the point that a constructive trust requires wrongful conduct, not

simply an unfair result.  *Commodity Futures Trading Commission v. Heritage Capital*

*Advisory Services*, 823 F.2d 171, 172 (7th Cir 1987) ("Before a constructive trust will be

imposed, there must be some wrongdoing on the part of the legal owner.").  U&H has not

suggested any basis for concluding that Steinberg obtained the Lender Funds wrongfully—as

a result of fraud, breach of fiduciary duty, duress, coercion, mistake, or any other misconduct.

To the contrary, Steinberg openly asserted the interests of the RTC estate in the Lender

Funds; he sought to obtain the funds through litigation, and ultimately did obtain the funds

through the Steinberg/Lender Settlement, which was fully disclosed and approved by the

court. This course of conduct was completely proper.

        In any event, to the extent that Steinberg did receive, on behalf of the Chapter 7 estate,

the benefit of unpaid work by Szilagyi and U&H in administering of the case in Chapter 11,

the result is fully consistent with bankruptcy policy—providing the funds necessary to

administer a Chapter 7 liquidation—and not a "windfall."  In an administratively insolvent

Chapter 11 case, parties who provided benefits to the estate—by definition, all of the Chapter

11 administrative creditors—receive less than the full value of their services.  For example, a

creditor who expends substantial effort in finding a hidden asset during the administration of a

case in Chapter 11 is awarded an administrative claim for its expenses under § 503(b)(3)(D)

but is not paid in full from the proceeds of that asset.  Rather, the creditor must share pro rata

with every other Chapter 11 administrative creditor, after payment of Chapter 7

---

        [8] In order to obtain the Lender Funds, Steinberg (1) filed and argued the motion to
approve the Szilagyi/Lender Settlement, which Szilagyi and U&H had withdrawn, (2) resisted
the Lender's motion to vacate approval of that settlement, and (3) negotiated and obtained
approval of the Steinberg/Lender Settlement, which required complex negotiation of a
designation rights agreement, and which was likely facilitated by Steinberg's new complaint
against the Lenders.

administrative claims pursuant to § 726(b). *In re Ben Franklin Retail Store, Inc.*, 210 B.R. 315, 319 n.6 (Bankr. N.D. Ill. 1997). Similarly, a trustee's counsel who brings a successful lawsuit on behalf of the estate is not entitled to payment from the proceeds of the lawsuit. *In re Chewning & Frey Security, Inc.*, 328 B.R. 899, 918 (Bankr. N.D. Ga. 2005) ("[T]he purpose and function of counsel for the trustee is to benefit the estate. In fact, all administrative claimants assist the debtor in maintaining or augmenting the size of the estate . . . . If each of these parties are entitled to receive payment directly from the 'fund' or 'benefit' they had a duty to create, preserve, protect, or increase, the distribution scheme would be disrupted.").[9] U&H's claim for professional fees, like the claims of other Chapter 11 administrative claimants is this case, may not be paid in full, but that is the proper result of the priorities established by the Bankruptcy Code, not a wrongful result of conduct by the Chapter 7 trustee.

U&H's constructive fraud claim is also unlikely to succeed.

c. *Quantum meruit*. Finally, U&H asserts "quantum meruit" as a basis for an interest in the Lender Funds. This claim simply misconceives the nature of quantum meruit. Quantum meruit does not establish any right to a particular fund of money; it is

---

[9] Indeed, the more significant chance for a windfall here would come from an interpretation of § 506(c) that does not allow a trustee to enforce a surcharge against benefited collateral. If the *Nuclear Imaging* interpretation were adopted (see n.4, above), a secured creditor would be immune from surcharge (and thus receive a windfall) whenever the estate was insolvent, because the estate could not guarantee that the administrative creditor who benefited the collateral would be paid in full. With trustee unable to compel payment of the surcharge, it is not likely that a secured creditor would agree to the voluntary carve out that *Nuclear Imaging* proposes as the only way for an unpaid § 506(c) claim to be satisfied. *See In re K & L Lakeland, Inc.*, 128 F.3d 203, 212 (4th Cir. 1997) (Hamilton, J., concurring in part and dissenting in part) (restricting § 506(c) surcharges to situations in which the estate has or will pay the benefiting creditor in full "permits the very windfall § 506(c) was designed to prevent"). Similarly, under the *Debbie Reynolds* view that unpaid § 506(c) recoveries do not belong to the estate, the trustee for an insolvent estate could not pursue the recovery (using estate assets) when the estate could not benefit—again producing a likely windfall for the secured creditor. *See* David Gray Carlson, n. 6 above, 76 Am. Bankr. L.J. at 66 (*Hartford Underwriters* "has implied that the bankruptcy estate owns [§506(c)] claims. Otherwise, it has established a situation where, in many cases, the trustee inherently cannot afford to do her duty, which directly leads to a secured creditor windfall.").

simply "an equitable remedy applied to the law of contracts to avoid unjust enrichment for services rendered under a contract implied by law." *In re Southern Diversified Properties, Inc.*, 110 B.R. 992, 996 (Bankr. N.D. Ga. 1990). U&H has no need for an equitable remedy to establish its right to compensation for services; it has an express contract with Szilagyi as Chapter 11 trustee, an agreement approved by the court and governed by the Bankruptcy Code. For the reasons discussed in connection with its constructive trust claim, U&H cannot employ quantum meruit to evade the priorities established by the Code. The only bankruptcy decision cited by U&H in support of its claim, *American National Bank & Trust Co. v. Stackler & Holstein (In re Holstein, Mack & Klein)*, 2000 WL 343795 (Bankr. N.D. Ill. March 31, 2000), offers no support for any contrary conclusion. Rather than dealing with the claim of a bankruptcy professional, *Holstein* discusses the quantum meruit claims that the debtor—a law firm no longer doing business—might have had against its former clients. There is no likelihood that U&H's quantum meruit claim would result in any recovery.

3. *U&H's claim for transition services.* U&H has never made a claim for services rendered to Steinberg as Chapter 7 trustee. Nevertheless, the Steinberg/U&H settlement allocates $35,816.50 of the total cash payment to U&H for such services. There is no basis for such a payment. In *Lamie v. U.S. Trustee*, 540 U.S. 526 (2004), the Supreme Court dealt with an almost identical situation: the attorney for a Chapter 11 debtor in possession (exercising the power of a Chapter 11 trustee) provided services in the case after its conversion. Because the Chapter 7 trustee had not retained the attorney under § 327 of the Code, the Supreme Court held that no compensation could be allowed. *Lamie*, 540 U.S. at 531 (affirming circuit decisions interpreting § 330(a) of the Code to provide that "fees may be awarded to attorneys for services rendered only to the extent they are payments to 'a professional person employed under section 327[.]'"). Moreover, the Court found that this result reflected a reasonable policy determination:

20

Sections 327 and 330, taken together, allow Chapter 7 trustees to engage attorneys, including debtors' counsel, and allow courts to award them fees. *See* §§ 327(a) and (e). Section 327's limitation on debtors' incurring debts for professional services without the Chapter 7 trustee's approval is not absurd. In the context of a Chapter 7 liquidation it advances the trustee's responsibility for preserving the estate.

*Id.* at 537.

Steinberg has not sought to employ U&H under § 327, and U&H therefore cannot be compensated for services provided after the case was converted to Chapter 7.

4. *Net litigation outcome.* On their conflicting cash claims, then, the RTC estate is likely to recover $376,235.54 from U&H, while U&H is likely to recover nothing from the estate. A settlement of these claims that provides a net payment from the estate to U&H is substantially outside the reasonable range of litigation outcomes, and so may not be approved.

B. *The allowed Chapter 11 administrative expenses.*

In addition to its cash payment to U&H, the Steinberg/U&H Settlement also proposes to give both U&H and Szylagyi allowed Chapter 11 administrative claims for their professional services. Section 330 of the Bankruptcy Code gives courts the power—and the duty, many decisions hold—to review fee applications independently. *In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 841 (3d Cir. 1994); *In re Chas. A. Stevens & Co.,* 105 B.R. 866, 870 (Bankr. N.D. Ill. 1989). There is nothing improper in a trustee agreeing not to object to the fees sought by a particular professional, but the absence of an objection cannot limit judicial review or render the fees allowed as an administrative expense. "Even if no objections are raised to a fee application, the Court is not bound to award the fees sought . . . ." *Chas. A. Stevens,* 105 B.R. at 870. And so, although "private compensation agreements are permissible under the Code, the Court retains the responsibility of ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330." *Id.* The Steinberg/U&H

21

Settlement must also be disapproved, then, insofar as it proposes to eliminate independent judicial review of the Szilagyi and U&H fee applications by awarding administrative claims in fixed amounts.[10]

### Conclusion

For the reasons stated above, a separate order will be entered, denying the Chapter 7 trustee's motion to approve the Steinberg/ U&H Settlement.

Dated:  December 4, 2006

Eugene R. Wedoff
United States Bankruptcy Judge

---

[10] The allowance of the Szilagyi and U&H claims proposed by the Steinberg/U&H Settlement is particularly problematic because the fee applications submitted in support of these claims include significant items that the court would not likely approve, such as requests for reimbursement on account of computer assisted legal research (CALR) that appear to be allocations of overhead expenses. *See In re New Hampshire Elec. Coop., Inc.*, 146 B.R. 890, 902 (Bankr. D. N.H. 1992) (stating that where CALR "has a fixed cost subscriber fee, similar to the cost of subscribing to legal digests and reporters," the cost "is and should be properly included as an overhead expense.").

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| Honorable | Eugene R. Wedoff | Hearing Date | 1/18/07 |
|---|---|---|---|
| Bankruptcy Case No. | 99 B 35434 | Adversary No. | 06 A 00907 |

Title of Case: Ungaretti & Harris LLP vs. Jay Steinberg, not individually but as Chapter 7 Trustee for Resource Technology Co.

Brief Statement of Motion: Defendant's Motion for Judgment on the Pleadings #56
Plaintiff's Motion for Preliminary Injunction #4

Names and Addresses of moving counsel: Miriam Stein, Arnstein & Lehr for Defendant / Trustee
Jeffrey Rose Tishler & Wald Ltd for Plaintiff

Representing:

## ORDER

This matter coming before the Court on the status of the Adversary and on the Motions set forth above.
For the reasons stated in Court and set forth in this Court's Memorandum Order entered on 12/4/06,
IT IS HEREBY ORDERED that:
① Defendant's Motion for Judgment on Pleadings is Granted.
② Plaintiff's Motion for Preliminary Injunction is denied.
③ Judgment on the adversary is hereby entered and granted in favor of Defendant and against Plaintiff.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNGARETTI & HARRIS LLP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Case No. 07 C 1292 and |
| | ) | Case No. 07 C 1293 |
| | ) | (consolidated) |
| | ) | |
| | ) | |
| JAY A. STEINBERG, not individually but | ) | |
| solely as Chapter 7 Trustee for RESOURCE | ) | |
| TECHNOLOGY CORPORATION, | ) | |
| | ) | |
| Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This bankruptcy appeal arises from an adversary proceeding that is part of the bankruptcy

of Resource Technology Corporation ("RTC"). Plaintiff-appellant Ungaretti & Harris, LLP

("Ungaretti") served as counsel to the Chapter 11 trustee of RTC's estate before the case was

converted to a Chapter 7 liquidation. In late 2006, defendant-appellee Jay Steinberg, RTC's

Chapter 7 trustee, sought the bankruptcy court's approval for a settlement that he had reached

with Ungaretti concerning its claims to certain funds in the possession of the Chapter 7 estate.

The bankruptcy court denied approval and gave the parties a week to file motions for summary

judgment. Steinberg's ensuing motion for judgment on the pleadings was granted in January

2007. Ungaretti now appeals from the bankruptcy court's denial of approval for the Steinberg-

Ungaretti settlement and its grant of judgment on the pleadings for the Chapter 7 estate, as well

as its denial of Ungaretti's request for a preliminary injunction barring disbursement of certain

1

funds held by Steinberg. For the reasons set forth below, the Court affirms the bankruptcy court's rulings.

## I. Background

### A.    The RTC bankruptcy case and Ungaretti's adversary proceeding

The background of the RTC bankruptcy case, ably described by the bankruptcy court in its December 4, 2006 opinion, *Ungaretti & Harris LLP v. Steinberg (In re Resource Tech. Corp.)*, 356 B.R. 435, 438-43 (Bankr. N.D. Ill. 2006), is summarized below.

RTC's business involved removing methane gas from landfills and, where possible, selling the gas or converting it to usable energy. In November 1999, RTC was made the subject of an involuntary bankruptcy proceeding. It consented to entry of an order for relief in January 2000.

RTC's principal secured creditors, at all relevant times, have been a group including Leon Greenblatt, Banco Panamericano, Chiplease, Inc., and other related entities (collectively, "the Lenders"). The Lenders, who include controlling persons of RTC, provided RTC's debtor-in-possession financing, secured by a lien on nearly all of its assets.

RTC operated as a debtor in possession until August 2003. At that point, problems with its management, including unauthorized payments to professionals and failures to file timely operating reports, led to the appointment of Gregg Szilagyi, an attorney then employed by Ungaretti, as the Chapter 11 trustee. Szilagyi administered the RTC estate for about two years, with Ungaretti as his counsel.

In June 2005, Szilagyi and the Lenders reached an agreement ("the Szilagyi-Lender settlement"), one byproduct of which is at the core of the adversary proceeding and this appeal.

2

This settlement provided that Szilagyi would pursue a motion to dismiss the RTC bankruptcy case, suspend any action affecting the Lenders' collateral pending a ruling on the motion to dismiss, seek dismissal of an injunctive proceeding Szilagyi had brought against the Lenders' lien enforcement activities, and file a timely notice of appeal with respect to an order entered against RTC in another adversary proceeding. In return, the Lenders agreed to pay $2 million in satisfaction of claims that Ungaretti asserted under section 506(c) of the Bankruptcy Code as compensation for preserving the Lenders' collateral. The Lenders transferred $1.5 million of this amount ("the Lender Funds") to Ungaretti when the Szilagyi-Lender settlement was executed, even though the settlement was not to become effective until the bankruptcy court approved it.

Two days after the Szilagyi-Lender settlement's execution, Szilagyi filed a motion seeking approval of the settlement and dismissal of the bankruptcy case. The motion generated objections from creditors other than the Lenders, and a hearing on the motion was held on September 19-20, 2005. During the hearing, the bankruptcy court expressed the view that any recovery on the section 506(c) claim asserted by Szilagyi and Ungaretti would belong to the RTC estate, so that the provision of the settlement calling for payment directly to Ungaretti could not be approved. In response, Szilagyi withdrew his request for approval of the settlement.

Also at the hearing, the bankruptcy court found problems that required further bankruptcy administration, notably Ungaretti's receipt of roughly $376,000 from the RTC estate without court authorization. (The bankruptcy court had made Ungaretti's compensation for its work as Szilagyi's counsel "subject to the court's subsequent approval as part of the normal interim fee application process approximately every 120 days"—approval Ungaretti did not seek

3

until twenty-two months after it began collecting payments for its work. *In re Resource Tech. Corp.*, 356 B.R. at 444 n.1.) On September 21, 2005, the court entered an order denying Szilagyi's motion for approval of the Szilagyi-Lender settlement "to the extent not withdrawn" and entered another order converting the case to Chapter 7. Steinberg was appointed Chapter 7 trustee. Thereafter, Ungaretti voluntarily transferred the Lender Funds to Steinberg's counsel, to be held in escrow. Ungaretti, the Lenders, and the Chapter 7 estate all continued to assert claims on the Lender Funds.

In December 2005, Steinberg sought to terminate the Lenders' claim to the Lender Funds through a new motion to approve the Szilagyi-Lender settlement. Steinberg argued that Szilagyi had done all that was required of him under the settlement agreement and that the agreement would be enforceable upon the court's approval. Steinberg contended, however, that he, as Szilagyi's successor, should obtain the benefits of the settlement for RTC's Chapter 7 estate. The bankruptcy court granted the motion, but the Lenders responded by seeking to vacate approval of the settlement.

In February 2006, Steinberg sought the bankruptcy court's approval for a new settlement with the Lenders ("the Steinberg-Lender settlement") designed, among other things, to settle the question of the Lender Funds by placing them with the Chapter 7 estate, with the Lenders waiving any claims to the funds. In March 2006, the bankruptcy court approved the Steinberg-Lender settlement; the Lenders' motion to vacate the court's approval of the Szilagyi-Lender settlement was withdrawn as moot. The Steinberg-Lender settlement thus effectively superseded the earlier Szilagyi-Lender settlement. Pursuant to the Steinberg-Lender settlement, the bankruptcy court entered an order authorizing Steinberg's counsel "to distribute $1.5 million of

4

the funds held in escrow relating to the Settlement Agreement to Steinberg for the benefit of the Estate" on March 28, 2006.

In response to these developments, Ungaretti in April 2006 filed the adversary proceeding from which this appeal arises. Ungaretti sought injunctive relief and turnover of the Lender Funds, asserting three grounds for claiming the funds. First, Ungaretti contended that because its services provided the basis for the section 506(c) claim created by the Szilagyi-Lender settlement, it was entitled to the Lender Funds as a section 506(c) recovery. Second, Ungaretti contended it was entitled to the imposition of a constructive trust on the Lender Funds for unpaid trustee fees and attorneys' fees. Third, Ungaretti asserted it had a claim in *quantum meruit* for its services that entitled it to the Lender Funds. Along with its adversary complaint, Ungaretti filed a motion for preliminary injunction to prevent Steinberg from expending the Lender Funds.

Before the bankruptcy court could enter a ruling on the motion for preliminary injunction or the pending fee applications of Szilagyi and Ungaretti, Steinberg proposed yet another settlement (the "Steinberg-Ungaretti settlement"). Under the agreement, Ungaretti and Szilagyi would waive their claims to the Lender Funds. In exchange, the Chapter 7 RTC estate was to pay roughly $250,000 to Ungaretti for its work as Szilagyi's counsel and for "transition services" that benefitted Steinberg's Chapter 7 administration. Ungaretti was also to receive an allowed Chapter 11 administrative claim of roughly $1.8 million and a waiver of the estate's claim for disgorgement of the unauthorized payments Ungaretti had received from the RTC Chapter 11 estate. Szilagyi was to receive an allowed Chapter 11 administrative claim in the amount of $250,000. The Lenders opposed Steinberg's motion to approve the settlement.

5

**B.     The bankruptcy court's December 4, 2006 order**

In an order dated December 4, 2006, the bankruptcy court denied approval for the

Steinberg-Ungaretti settlement.  The bankruptcy court reasoned that the consideration Ungaretti

would receive under the settlement was not in the best interests of the Chapter 7 RTC estate

under section 363 of the Bankruptcy Code and *In re Telesphere Communications, Inc.*, 179 B.R.

544, 552 (Bankr. N.D. Ill. 1994).  Specifically, the bankruptcy court concluded the net cash

payment to Ungaretti was outside the range of reasonable litigation outcomes because Ungaretti

had no serious chance of prevailing on its claim to the Lender Funds.  In contrast, the estate was

"very likely [to] succeed" in its claim for disgorgement of the unauthorized payments because

the estate lacked the resources to pay its Chapter 7 administrative expenses, which section

726(b) of the Bankruptcy Code places ahead of Chapter 11 administrative claims in cases such

as this one. *In re Resource Tech. Corp.*, 356 B.R. at 443.

None of Ungaretti's three bases for asserting a claim to the Lender Funds "ha[d] any

likelihood of success," the bankruptcy court concluded.  *Id.* at 444.  Ungaretti's argument that

the funds were a section 506(c) surcharge against the Lenders' collateral failed because

Ungaretti was not awarded the funds pursuant to a bankruptcy trustee's request, as required by

*Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 9 (2000)—and in any event,

a section 506(c) surcharge recovery cannot properly be paid to an individual administrative

creditor, but can only be recovered for the estate's benefit.  *In re Resource Tech. Corp.*, 356 B.R.

at 444-45.

Ungaretti's argument for a constructive trust failed, the bankruptcy court held, because

the wrongful conduct typically required under Illinois law for the imposition of a constructive

trust was absent.  Ungaretti's argument that the Lender Funds were a "windfall" for the Chapter

7 estate because it was Ungaretti's efforts that led the Lenders to pay out the $1.5 million was at

odds with the "bankruptcy policy [of] providing the funds necessary to administer a Chapter 7

liquidation." *Id.* at 447-48. Ungaretti's claim for fees for its services, the bankruptcy court held,

"like the claims of other Chapter 11 administrative claimants in this case, may not be paid in full,

but that is the proper result of the priorities established by the Bankruptcy Code, not a wrongful

result of conduct by the Chapter 7 trustee." *Id.* at 448.

Finally, the bankruptcy court rejected Ungaretti's *quantum meruit* claim, holding that this

quasi-contractual remedy cannot create a right to a particular fund, but operates only to prevent

unjust enrichment. *Id.* at 448-49. In any event, Ungaretti had no need of such an equitable

remedy to establish its right to be paid for its work for the Chapter 11 estate because of its

express contract with Szilagyi. *Id.* at 449. The bankruptcy court rejected Ungaretti's attempt to

"employ quantum meruit to evade the priorities established by the Code." *Id.*

The bankruptcy court also characterized the Chapter 7 estate's proposed payment to

Ungaretti for "transition services" as baseless—Steinberg had never employed Ungaretti under

section 327 of the Bankruptcy Code—and therefore as another reason to hold the settlement to

be outside the range of reasonable litigation outcomes. *Id.* at 449. The bankruptcy court also

rejected the settlement provisions awarding Szilagyi and Ungaretti administrative claims in fixed

amounts "insofar as it propose[d] to eliminate independent judicial review" of their claims. *Id.*

at 449-50.

On December 5, 2006, the bankruptcy court entered an order giving the parties to the

adversary proceeding leave to file motions for summary judgment. Both Ungaretti and

Steinberg acknowledge that Steinberg's motion for judgment on the pleadings under Federal

Rule of Civil Procedure 12(c), filed one week later, relied on the bankruptcy court's reasoning in

7

its December 4, 2006 ruling. Ungaretti Br. at 11; Steinberg Br. at 6. The bankruptcy court did

not issue a detailed decision in support of its January 18, 2007 order granting Steinberg's

motion; rather, its one-page minute order referred to the reasoning given in its December 4, 2006

order.[1] Thus, the Court will look to the reasoning of the December 4, 2006 order in reviewing all

three of the bankruptcy court's decisions challenged on appeal—the denial of approval for the

Steinberg-Ungaretti settlement, the denial of Ungaretti's motion for a preliminary injunction, and

entry of judgment on the pleadings for Steinberg.

## II. Discussion

### A.    Jurisdiction and standards of review

The Court has jurisdiction pursuant to 28 U.S.C. § 158(a). In general, under Federal Rule

of Bankruptcy Procedure 8013, the Court reviews the bankruptcy court's findings of fact for

clear error and its conclusions of law, including its interpretation of the Bankruptcy Code, *de*

*novo. In re Heartland Steel*, 389 F.3d 741, 743-44 (7th Cir. 2004).

In this context, the Court acts as an appellate court and applies the same standards of

review as are appropriate in other appellate decisions. *Green v. Mass. Cas. Ins. Co.*, 269 B.R.

782, 787 (N.D. Ill. 2001). Accordingly, the Court reviews *de novo* an order granting a motion

for judgment on the pleadings under Rule 12(c), accepting all well-pleaded allegations in the

complaint as true and drawing all reasonable inferences in favor of the plaintiff. *Forseth v.*

*Village of Sussex*, 199 F.3d 363, 368 n.6 (7th Cir. 2000). "If a defendant raises a Rule 12(b)

defense in a Rule 12(c) motion, a Rule 12(b)(6)-type analysis applies." *Killingsworth v. HSBC*

*Bank Nev., N.A.*, 507 F.3d 614, 619 (7th Cir. 2007) (*citing Alexander v. City of Chicago*, 994

---

[1] The January 18, 2007 minute order also refers to reasons given in open court. Neither party,
however, has made a transcript of those proceedings a part of the record on appeal.

F.2d 333, 336 (7th Cir. 1993)). Under this analysis, the plaintiff's allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (*citing Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 127 S.Ct. at 1964-65.

The denial of a preliminary injunction is reviewed for abuse of discretion. *Vencor, Inc. v. Webb*, 33 F.3d 840, 844 (7th Cir. 1994) (*citing Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)). Approval or denial of a settlement is likewise reviewed for abuse of discretion. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007) (*citing Depoister v. M. Holloway Fdn.*, 36 F.3d 582, 586 (7th Cir. 1994)).

## B.    Grant of judgment on the pleadings for Steinberg

Ungaretti appeals from the bankruptcy court's grant of Steinberg's motion for judgment on the pleadings, but it does not directly address this ruling in its appellate briefs. Rather, it focuses on the bankruptcy court's denial of the preliminary injunction for which Ungaretti moved the bankruptcy court on the same day that it filed its complaint. The Court assumes that Ungaretti's failure to address directly the bankruptcy court's grant of judgment on the pleadings for Steinberg stems from the overlap in the relief Ungaretti sought in its complaint and in its motion for a preliminary injunction.

Because the Court is reviewing a grant of judgment under Rule 12(c), it must assess the pleadings in their own right under the appropriate, *de novo* standard of review. *See Forseth*, 199

9

F.3d at 368. Ungaretti advances three theories under which it asserts it is entitled to the Lender Funds in its complaint.

### 1.    Section 506(c) surcharge theory

In Count 1 of its complaint, Ungaretti sought an order enjoining Steinberg from making any disbursements from the Lender Funds, allowing Ungaretti a section 506(c) surcharge, and requiring turnover to Ungaretti of the "reasonable and necessary" costs stemming from its work for the RTC Chapter 11 estate. Ungaretti Compl. ¶¶ 22-27.

The threshold question for the Court concerns the applicability of section 506(c), and specifically whether the Lender Funds constitute a surcharge under that section. Section 506(c) provides that

> [t]he trustee may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c). The recovery of these "reasonable, necessary costs and expenses" out of the secured property is called a surcharge.

As the Supreme Court has explained, section 506(c) "constitutes an important exception to the rule that secured claims are superior to administrative claims." *Hartford Underwriters*, 530 U.S. at 5. The trustee or debtor-in-possession may use this provision of the code to recover administrative costs from estate property encumbered by the security interests of secured creditors such as the Lenders in this case. The Supreme Court in *Hartford Underwriters* clarified that *only* the trustee or debtor-in-possession may invoke section 506(c); the statute "does not provide an administrative claimant an independent right to seek payment of its claim" from secured creditors' collateral. *Id.* at 14.

10

Thus, the trustee's role is critical under section 506(c). So, too, is that of the bankruptcy court, which must approve section 506(c) surcharges. To gain this approval, the trustee or debtor-in-possession must show that the costs and expenses sought to be surcharged were reasonable and necessary to preserve or dispose of the collateral and that their incurrence provided some benefit to the secured creditor, or that the secured creditor caused or consented to that incurrence. 11 U.S.C. § 506(c); *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260-61 (9th Cir. 2000) (*citing In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987)).

Did either RTC bankruptcy trustee seek and obtain bankruptcy court approval for a section 506(c) surcharge in connection with the Lender Funds? Ungaretti argues that the Lender Funds were paid "through § 506(c) on the request of a Trustee" because Steinberg's December 2005 motion for approval of the Szilagyi-Lender settlement characterized the Lender Funds as a surcharge pursuant to section 506(c), as did the bankruptcy court's initial approval of the settlement. Ungaretti Br. at 14. Ungaretti also argues that the Lender Funds arise under section 506(c) because the Lenders actually paid the $1.5 million pursuant to an settlement agreement negotiated by Szilagyi, who was then trustee of the Chapter 11 RTC estate. Ungaretti Reply Br. at 5.

Steinberg argues that the Lender Funds are not a section 506(c) surcharge because the bankruptcy court never issued an order approving a surcharge against the Lenders' collateral, and therefore "these proceedings have nothing to do with § 506(c)." Steinberg Br. at 8. The bankruptcy court took the same view, holding that Ungaretti "was not given an allowance under § 506(c) on motion of a trustee" with attendant approval by the court. *In re Resource Tech. Corp.*, 356 B.R. at 438. The bankruptcy court noted that Szilagyi had abandoned his motion for

11

approval of the Szilagyi-Lender settlement in 2005 and that the court had ultimately approved

payment of the Lender Funds under the Steinberg-Lender settlement "with no specific amount

allocated to a § 506(c) surcharge." *Id.* at 444.

Ungaretti's arguments for why the Lender Funds constitute a section 506(c) surcharge do

not raise a plausible prospect of its entitlement to the relief it sought. It is true, as Ungaretti

notes, that the language of the Szilagyi-Lender agreement referred to a "506(c) settlement" and

that Steinberg and the bankruptcy court appear to have used that term. But that is not dispositive

of the legal question now before the Court; the question is what actually happened, not the

phraseology that was used. Second, whatever the understanding between the trustee and other

parties to a settlement might have been, the trustee must seek and obtain bankruptcy court

approval for a section 506(c) surcharge. For this reason, Ungaretti's argument that "[t]he

Lenders paid this money pursuant to the § 506(c) settlement . . . [whose] terms were negotiated

by the Chapter 11 Trustee" is unavailing. As the bankruptcy court noted, the transfer of the

Lender Funds at the time the Szilagyi-Lender settlement was executed was premature because

"the settlement would not become effective unless approved by the court." *In re Resource Tech.*

*Corp.*, 356 B.R. at 440. When the bankruptcy court ultimately approved the transfer of the

Lender Funds (in its March 2006 order approving the later Steinberg-Lender settlement), it did

not refer to section 506(c). The Lenders' act of transferring the $1.5 million to the Chapter 11

estate in June 2005 does not, without more, make the Lender Funds a section 506(c) surcharge.

Nor can Ungaretti legitimately rely on language concerning a settlement that was ultimately

superseded by a later settlement that did not contain the same language.

Moreover, shortly after it approved the Szilagyi-Lender settlement, the bankruptcy court

took under advisement a motion to vacate that order filed by Lender entities. Although that

motion was withdrawn as moot upon the approval of the Steinberg-Lender settlement, the

bankruptcy court took the view that the Lenders' objections were "substantial" and that the

court's decision to take the motion under advisement meant that "the enforceability of the

Szilagyi/Lender Settlement and the disposition of the Lender Funds were still unresolved" in

early 2006. *In re Resource Tech. Corp.*, 356 B.R. at 441. Therefore, even the bankruptcy

court's initial approval of the Szilagyi-Lender settlement on Steinberg's motion does not

establish that the Lender Funds constitute a section 506(c) surcharge—and, in any event,

Ungaretti declines to argue here that this approval had that effect.

For these reasons, the Court does not regard the Lender Funds as a section 506(c)

surcharge. Accordingly, Ungaretti's theory that it is entitled to the funds under section 506(c)

cannot ground the relief it seeks, and the bankruptcy court's entry of judgment on the pleadings

on this count of Ungaretti's complaint was proper. Because the Court determines that the

Lender Funds do not constitute a section 506(c) surcharge, it need not reach the question whether

Ungaretti would be able to bypass the priority scheme of the Bankruptcy Code and access the

funds directly.

## 2.    Constructive trust

In Count 2 of its complaint, Ungaretti sought the imposition of a constructive trust on the

Lender Funds in addition to an order enjoining Steinberg from making any disbursements from

the funds and requiring the turnover of its reasonable and necessary costs. On appeal, Ungaretti

argues that if the Lender Funds are retained by the Chapter 7 estate, they will be a "windfall"

that unjustly enriches the estate. Ungaretti further argues that Illinois law does not strictly

require wrongdoing as a precondition for the imposition of a constructive trust, as the bankruptcy

court reasoned when it rejected this theory.

Steinberg counters that Illinois law requires either actual or constructive fraud or a breach of fiduciary duty to impose a constructive trust, and that Ungaretti cannot show either kind of wrongdoing by a trustee in this case. Steinberg also argues that Ungaretti has a Chapter 11 administrative claim to the assets of the estate, whose priority relative to other claims is dictated by the Bankruptcy Code. Under this circumstance, Steinberg argues, Ungaretti should not be allowed to circumvent the code by means of an equitable remedy.

Ungaretti appears to be correct that Illinois law, which bears on this aspect of the case pursuant to 28 U.S.C. § 959(b), does not always require wrongdoing as a prerequisite to the imposition of a constructive trust. Both the bankruptcy court in its December 4, 2006 order and Steinberg in this appeal rely on *Suttles v. Vogel*, 126 Ill. 2d 186, 533 N.E.2d 901 (1988), for the rule that "a constructive trust will not be imposed unless the complaint makes specific allegations of wrongdoing, such as fraud, breach of fiduciary duty, duress, coercion or mistake." *Id.* at 194. Ungaretti points to *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 735 N.E.2d 560 (2000), a case decided after *Suttles*, to support its argument that wrongdoing is not always a precondition for a constructive trust. *Smithberg* holds that "[a]lthough some form of wrongdoing is generally required for the imposition of a constructive trust . . . a constructive trust may be imposed in the case of mistake, although no wrongdoing is involved." *Id.* at 299, 735 N.E.2d at 565 (*citing Martin v. Heinhold Commodities, Inc.*, 163 Ill.2d 33, 55-56, 643 N.E.2d 734, 745 (1994)). In essence, *Smithberg* suggests that a mistake, in the sense of an asset being conveyed to one whom the grantor did not intend to receive it or whom the grantor mistakenly believed was entitled to it, *see Dubis v. Zarins (In re Tiranis)*, 128 F.3d 469, 473 (7th Cir. 1997) (applying Wisconsin constructive trust principles), might ground the imposition of a constructive trust.

Even if Ungaretti has offered an accurate statement of Illinois law, however, its theory of a constructive trust cannot ground the relief it seeks. Beyond its bare allegation that "in equity and good conscience, [Steinberg] ought not to be allowed to retain" the Lender Funds, Ungaretti Compl. ¶ 31, Ungaretti's pleadings do not sound in the equitable principles that justify imposition of a constructive trust. Ungaretti does not allege that any specific equitable principle will be violated if the Chapter 7 estate holds the funds (or uses them to pay Chapter 7 administrative costs). Nor could it do so. Steinberg now holds the Lender Funds for the Chapter 7 estate pursuant to the bankruptcy court's March 28, 2006 order. In issuing that order, the bankruptcy court accepted Steinberg's argument that Ungaretti's claim of unjust enrichment contravenes the Bankruptcy Code's scheme for compensation of professionals, which makes Chapter 11 administrative claims such as Ungaretti's subordinate to Chapter 7 claims. 11 U.S.C. § 726(b). Thus, even assuming that a mistake might provide the basis for a constructive trust under Illinois law, Ungaretti does not and cannot point to a mistake by anyone involved—the bankruptcy court, the Lenders, or Steinberg—that has resulted in unjust enrichment of the Chapter 7 estate. The court-approved transfer of the Lender Funds to the Chapter 7 estate was not a mistake in the legal sense. Nor does Ungaretti allege any other form of wrongful conduct in connection with the transfer of the funds to the estate.

Finally, the Court notes that the bankruptcy court has rejected Ungaretti's argument for the imposition of a constructive trust twice, once in connection with Steinberg's motion to have the Lender Funds transferred from Arnstein to the Chapter 7 estate, and again in connection with Ungaretti's motion for a preliminary injunction, which it denied. Ungaretti's argument is similarly unpersuasive to this Court.

15

For these reasons, the Court concludes that Ungaretti's claim that it is entitled to the imposition of a constructive trust over the Lender Funds cannot ground the relief it seeks. Accordingly, the bankruptcy court's entry of judgment on the pleadings on this count of Ungaretti's complaint was proper.

### 3.     *Quantum meruit*

In Count 3 of its complaint, Ungaretti sought an order enjoining Steinberg from making any disbursements from the funds and requiring the turnover of its reasonable and necessary costs under a theory of *quantum meruit*. Ungaretti argues that its work for the Chapter 11 trustee conferred a benefit on the RTC bankruptcy estate, the Chapter 7 estate's retention of which without payment is unjust enrichment.

Steinberg argues that Ungaretti must look to the Chapter 11 administrative claim it has asserted and may not circumvent the priority scheme established by the Bankruptcy Code via a principle of equity. (This is the same objection Steinberg makes in response to Ungaretti's argument for the imposition of a constructive trust.) Steinberg also asserts that *quantum meruit* cannot give Ungaretti a right to a particular fund, such as the Lender Funds. The bankruptcy court articulated the same reasoning in denying Ungaretti's motion for a preliminary injunction.

The Court agrees that Ungaretti's argument on this point closely tracks its unpersuasive argument for the imposition of a constructive trust. The Court regards Ungaretti's invocation of both theories as ill-conceived attempts to evade the reality of its situation as a Chapter 11 administrative claimant in a case that has since been converted to Chapter 7—a step that relegated to a lower tier Ungaretti's claims to the estate's assets. Moreover, Ungaretti and Szilagyi's own conduct may well have contributed to this development: the bankruptcy court found at the September 2005 hearing that Ungaretti's receipt of roughly $376,000 from the RTC

16

estate without the court's authorization showed "a need for further bankruptcy administration," leading to the case's conversion to Chapter 7 and Steinberg's appointment. *In re Resource Tech.*, 356 B.R. at 440. Ungaretti hardly has the "clean hands" required of a party seeking equitable relief. *See, e.g., Gutierrez v. Gonzalez*, 458 F.2d 688, 693 (7th Cir. 2006) (citing the "venerable doctrine that he who comes into equity must come with clean hands").

The Court concludes that Ungaretti's claim of unjust enrichment and entitlement to the Lender Funds under a *quantum meruit* theory cannot ground the relief it seeks. Accordingly, the bankruptcy court's entry of judgment on the pleadings of this count of Ungaretti's complaint was proper.

## C.    Denial of preliminary injunction

Ungaretti also appeals from the bankruptcy court's denial of its motion for a preliminary injunction. The Court has addressed and rejected the three theories under which Ungaretti asserts it is entitled to the Lender Funds in reviewing, *de novo*, the bankruptcy court's grant of Steinberg's motion for judgment on the pleadings. The Court can therefore say that Ungaretti is unable meet the first requirement for a preliminary injunction, namely, a reasonable probability of success on the merits. Accordingly, the bankruptcy court's denial of Ungaretti's motion for a preliminary injunction, which the Court reviews for an abuse of discretion, was proper.

**D.    Settlement agreement**

Ungaretti also asks the Court to reverse the bankruptcy court's denial of the Chapter 7

trustee's motion to approve the Steinberg-Ungaretti settlement.  A threshold issue is whether

Ungaretti's appeal from denial of this motion was timely.  The bankruptcy court's order denying

the Chapter 7 trustee's motion was entered on December 4, 2006.  Ungaretti did not appeal that

order until January 26, 2007, the date on which it also appealed the bankruptcy court's January

18, 2007 order that granted Steinberg's motion for judgment on the pleadings, denied Ungaretti's

motion for a preliminary injunction, and granted judgment in Steinberg's favor.  Steinberg now

argues that under Federal Rule of Bankruptcy Procedure 8002(a), which provides that "notice of

appeal shall be filed with the clerk within 10 days of the date of the entry of the judgment, order,

or decree," Ungaretti's appeal is untimely.  Ungaretti counters that its appeal of the December 4,

2006 order is timely because that order was not a final, appealable order.

"In ordinary federal litigation, a final judgment is an order resolving all disputes of all

parties . . . .  However, because bankruptcy proceedings are often comprised of many discrete

disputes, most of which come to a logical conclusion before the entire estate is settled, courts

have generally interpreted [28 U.S.C.] § 158 finality more liberally than [28 U.S.C.] § 1291

finality."  *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1299 (7th Cir. 1997) (*citing* John P.

Hennigan, Jr., *Toward Regularizing Appealability in Bankruptcy*, 12 Bank. Dev. J. 583 (1996)).

That is, in the Seventh Circuit, courts "apply[] finality in the bankruptcy context with a relaxed

eye."  *Id.* (*citing In re Gould*, 977 F.2d 1038, 1040-41 (7th Cir. 1992) and *In re Powelson*, 878

F.2d 976, 980 (7th Cir. 1989)).  The first question the Court must ask, then, is whether this

approach to finality encompasses the bankruptcy court's refusal to approve the Steinberg-

18

Ungaretti settlement, such that Ungaretti was required to appeal it within ten days of December 4, 2006.

Ungaretti relies on *Providers Benefit Life Ins. Co. v. Tidewater Group, Inc. (In re Tidewater Group, Inc.)*, 734 F.2d 794 (11th Cir. 1984), for the proposition that unlike an order that approves a settlement, "[a]n order disapproving a compromise . . . is not final. It determines no rights and settles no issues. It merely leaves the question open for future adjudication." *Id.* at 796 (*quoting Tonkoff v. Synoground (In re Merle's Inc.)*, 481 F.2d 1016, 1018 (9th Cir. 1973)). This rule—that an order leaving some nontrivial quantum of issues open for later adjudication is not final—is widely accepted in the bankruptcy context. *See Brouwer v. Ancel & Dunlap (In re Firstmark Corp.)*, 46 F.3d 653, 658 (7th Cir. 1995) (describing the "criteria" the Seventh Circuit uses to "determine finality in the more flexible bankruptcy context" as whether the decision resolves the parties' substantive rights and whether it marks the conclusion of what, but for the bankruptcy case, would be equivalent to a stand-alone suit); *In re Forty-Eight*, 115 F.3d at 1299 (bankruptcy court's order denying a stay was not final because it did not "finally determine [certain creditors'] position vis a vis [debtor's] settlement trust."); *Dubin v. SEC (In re Johns-Manville Corp.)*, 824 F.2d 176, 179 (2d Cir. 1987) (*quoting In re Saco Local Dev. Corp.*, 711 F.2d 441, 444-46 (1st Cir.1983)) (an order of the bankruptcy court "may be immediately appealed if it disposes of discrete issues within the larger case"); *Lockwood v. Snookies, Inc. (In re F.D.R. Hickory House)*, 60 F.3d 724 (11th Cir. 1995); *Simons v. FDIC (In re Simons)*, 908 F.2d 643, 644-45 (10th Cir. 1990) (bankruptcy court's rejection of proposed Chapter 13 plan was not final because it did not end the litigation on the merits and "contemplate[d] significant further proceedings in the bankruptcy court").

Did the bankruptcy court's order leave some issues for later litigation, such that it was not final? One could argue—although Steinberg does not—that the order denying approval of the settlement and the bankruptcy court's order the next day granting the parties leave to file motions for summary judgment left little doubt as to the likely outcome of the adversary proceeding. After all, the bankruptcy court's finding that the Steinberg-Ungaretti settlement was outside the reasonable range of expected litigation outcomes rested on its view that Ungaretti "is likely to recover nothing from the estate." *In re Resource Tech. Corp.*, 356 B.R. at 449.

The Court, however, declines to give decisive effect to this logic for the purpose of determining whether the December 4 order was a final one from which Ungaretti could no longer appeal by January 18. A mere suggestion to the parties of the likely outcome of a dispositive motion does not amount to an immediately appealable, final decision. *Cf. Expeditors Int'l of Wash., Inc. v. Citicorp N. Am., Inc. (In re Colortran)*, 218 B.R. 507, 510 (B.A.P. 9th Cir. 1997) (order was final where the bankruptcy court went beyond merely refusing to approve a settlement by invalidating a creditor's lien by ordering turnover of the property on which the lien was asserted). For these reasons, the Court determines that the order was not a final, immediately appealable order and therefore will consider the merits. *See In re Salem*, 465 F.3d 767, 774-75 (7th Cir. 2006) ("As a general rule, the failure to file an interlocutory appeal does not waive the ability to have an issue reviewed upon final appeal . . . To the contrary, one of the purposes of the final judgment rule is to permit consolidated review of all interlocutory decisions that still matter.").

As noted above, the Court reviews the bankruptcy court's decision to approve or deny approval to a proposed settlement for abuse of discretion. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d at 426. "If the decision demonstrates a command of the case, we will not engage

20

in second-guessing." *Id.* The bankruptcy court's December 4, 2006 order indeed demonstrates a thorough command of the case and the trajectory of the adversary proceeding. The bankruptcy court also applied the correct legal standard—the best interests of the debtor's estate, measured by a comparison of the proposed settlement's terms with the likely costs of litigation and an assessment of whether it is within the "reasonable range" of litigation outcomes, *id.*—in declining to approve the Steinberg-Ungaretti settlement. The Court cannot conclude that the bankruptcy court's denial of approval for the Steinberg-Ungaretti settlement amounted to an abuse of its discretion.

### III. Conclusion

For the foregoing reasons, the Clerk is directed to enter judgment affirming the decision of the bankruptcy court.

MATTHEW F. KENNELLY
United States District Judge

Date:   March 5, 2008

21

# EXHIBIT D

IN THE UNITED STATES BANKRUPTY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:

RESOURCE TECHNOLOGY
CORPORATION,

Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

## ORDER DIRECTING DISGORGEMENT OF FEES

This matter coming before the Court on the Motion ("Motion") of the Estate of Resource Technology Corporation (the "Estate"), by and through Jay A. Steinberg, not individually but solely as Chapter 7 Trustee (the "Chapter 7 Trustee") for an Order pursuant to 11 U.S.C. §§105 and 726 directing Ungaretti & Harris LLP ("Ungaretti") to disgorge all fees paid to Ungaretti by the Estate. The Court finds notice to be sufficient and being otherwise fully advised in the premises,

IT IS HEREBY ORDERED that Ungaretti is directed to disgorge the sum of $376,235.54 to the Chapter 7 Trustee for the benefit of the Estate within _____ days of the entry of this Order. *on or before July 15, 2008.* #2

Dated: **17 JUN 2008**

ENTERED:

_____
U.S. Bankruptcy Judge

CHICAGO_1133213_2 (2) (2).DOC

EXHIBIT

# EXHIBIT E

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILINOIS
EASTERN DIVISION**

In Re:                                          )
                                                )
Resource Technology Corporation,                )
                                                )    Case No.  99-35434
               Debtor.                          )
                                                )    Hon. Eugene R. Wedoff
                                                )    U. S. Bankruptcy Court Judge

## MOTION OF UNGARETTI & HARRIS, LLP TO STAY DISGORGEMENT PENDING RESOLUTION OF APPEAL

NOW COMES Ungaretti & Harris, LLP ("Ungaretti"), Appellant herein, by and through its attorneys, Bruce L. Wald, Jeffrey B. Rose and Natalia K. Rzepka of Tishler & Wald, Ltd., and for its Motion to Stay Disgorgement Pending Resolution of Appeal pursuant to Bankruptcy Rule 8005, respectfully states as follows:

1.       On June 17, 2008, this Bankruptcy Court entered an Order granting the Motion for Order Directing Disgorgement of Fees presented by Jay A. Steinberg, Not Individually but Solely as Chapter 7 Trustee for the Bankruptcy Estate of Resource Technology Corporation, ("Motion for Disgorgement"), Debtor herein.  The Motion for Disgorgement was based on §105 and §726 of the Bankruptcy Code.  A copy of the Order of disgorgement ("Disgorgement Order") is attached hereto as **Exhibit A** and made a part hereof.

2.       On or about June 26, 2008, Ungaretti filed its Notice of Appeal in regard to the Disgorgement Order.  A copy of the Notice of Appeal is attached hereto as **Exhibit B** and made a part hereof.

3.       The Disgorgement Order provides for disgorgement of the sum of $376,235.54 previously paid to Ungaretti as partial payment for fees and costs incurred in conjunction with

Ungaretti's representation of the Bankruptcy Trustee in this bankruptcy proceeding. The total fees and costs incurred by Ungaretti in its representation of the Bankruptcy Trustee is slightly less than $3 million dollars. The Disgorgement Order currently provides for the disgorgement of $376,235.54 to take place on or before July 18, 2008.

4.    Given the fast approaching deadline for disgorgement, Ungaretti now seeks to stay enforcement of the Disgorgement Order pending resolution of the Appeal.

5.    In determining whether to grant a stay pending appeal under Bankruptcy Rule 8005, a court must consider:  1) whether the appellant is likely to succeed on the merits of the appeal; 2) whether the appellant will suffer irreparable injury absent a stay; 3) whether a stay would substantially harm other parties in the litigation; and 4) whether a stay is in the public interest. In Re Mader, 100 B.R. 989, 990 (Bankr. N.D. IL 1989)(See also In the Matter of Forty-Eight Insulations, Inc., 115 F.3d 1294, 1300 (7th Cir. 1997)). A consideration of each of these factors indicates that the granting of a stay of the Disgorgement Order pending resolution of the Appeal is appropriate under the circumstances of this case.

### I.  Ungaretti Is Likely To Succeed On the Merits of Its Appeal

6.    The Bankruptcy Court entered the Disgorgement Order pursuant to §105, which provides for the Court's authority to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Code, and §726 of the Bankruptcy Code, which provides for distribution of property of the estate. See Disgorgement Order previously attached hereto as Exhibit A.   While §105 certainly provides the Bankruptcy Court with power to implement the provisions of the Code, §726 does not provide the authority to mandate disgorgement.  It simply mandates a pro rata distribution of a bankruptcy estate, containing no provision for adding property back to the estate. In re Hyman Freightways, Inc., 2006 U.S. Dist.

LEXIS 92206, *4 (U.S. Dist., MN 2006). "By its terms, §726(b) concerns only the distribution of the estate. It contains no provision for the collection, addition, or return of property of the estate. The statute's plain language simply does not speak to the remedy of disgorgement. Thus the bankruptcy court did not err in finding that the plain language of §726(b) does not require disgorgement." Id. at *7. Disgorgement of interim professional compensation is a matter of discretion. Id. Disgorgement is a harsh remedy that should only be applied in extreme situations and only when mandated by the equities of a case. In re CHC Industries, Inc. 2006 Bankr. LEXIS 4468, *13 (Bankr. M.D. Fl. 2006)(citing In re LTV Steel Company, Inc., 288 B.R. 775, 779 (Bankr. N.D. Ohio 2002) and also citing In re Anolik, 207 B.R. 34, 39 (Bankr. D. Mass. 1997)). Given the extreme nature of the disgorgement remedy and the circumstances of this case, the District Court is likely to find an abuse of discretion in the Disgorgement Order.

7.    A literal application of §726(b) would mandate disgorgement by all who had asserted claims and received payments in an administratively insolvent case. However, few cases exist where a non-professional was ordered to disgorge payment because of subsequent administrative insolvency. Anolik, 207 B.R. at 40 (Bankr. Mass. 1997)(Emphasis added). After all, if an estate is administratively insolvent, a pro rata distribution would require every administrative claimant to disgorge payments they received. The Anolik Court was troubled by this apparent double standard prevalent in administratively insolvent cases by noting as follows:

> *Where disgorgement by any party is ordered, such disgorgement should not exceed the amount that would be required to achieve a pro rata distribution assuming that all parties subject to disgorgement were ordered to relinquish funds, regardless of whether the court actually so ordered. A claimant required to disgorge should not suffer disproportionately simply because the court equitably waived disgorgement for another administrative claimant. Court authorized professionals are not second-class service providers, nor does their function include the disproportionate subsidization of bankruptcy cases.*

Id. (Emphasis added).

8.      Ungaretti incurred almost $3 million dollars in fees and out of pocket costs during the course of its representation of the Bankruptcy Trustee.  It received payment of a mere $376,235.54 of the almost $3 million dollars it has incurred in this case which this Court has ordered be disgorged.  This figure represents only 6% of the fees it incurred and over $200,000 in actual out pocket expenses it paid in administering this Estate. Throughout the pendency of its representation of the Bankruptcy Trustee, Ungaretti rendered a substantial benefit to the bankruptcy estate for which, if the Disgorgement Order is given full effect, it will not have received any compensation.  Furthermore, over $200,000.00 of the sum to be disgorged is comprised of actual out of pocket costs incurred by Ungaretti in its representation of the Bankruptcy Trustee.  A copy of Ungaretti's Cost Detail, submitted in conjunction with its Fee Application, is attached hereto as **Exhibit C** and made a part hereof.  It is respectfully stated that requiring Ungaretti to disgorge the only payment it received for slightly under $3 million in fees and expenses it incurred in the context of representing the Bankruptcy Trustee is tantamount to forcing Ungaretti to disproportionately subsidize the bankruptcy case.

9.      Furthermore, requiring Ungaretti to disgorge $376,235.54, over $210,000.00 of which is comprised of costs advanced on behalf of the Bankruptcy Trustee renders an even more egregiously inequitable and disproportionate result.  The Sixth Circuit, despite upholding a disgorgement order, has held that disgorgement of a transcript fee would operate as a windfall to the bankruptcy estate.  In re Kisseberth, 273 F.3d 714, 722 (6th Cir. 2001).  The Kisseberth Court determined that because the transcript funds were never part of the estate due to the fact that they were advanced to the debtor's attorney on behalf of the debtor's as what was essentially a post petition loan and should therefore be allocated to the "entity that made such payment."  Id. Analogously, disgorgement of the entire sum of $376,235.54, which includes over $200,000.00

- 4 -

of costs advanced on behalf of the Bankruptcy Trustee, would produce a windfall for the estate and must be excluded from any disgorgement. Given the inequitable result achieved by the Disgorgement Order and in view of the discretionary nature of awarding such a harsh remedy, it is respectfully stated that Ungaretti is likely to succeed on the merits of its appeal.

<b><u>Ungaretti Will Suffer Irreparable Injury<br>Absent a Stay of the Disgorgement Order</u></b>

10.    Absent a stay pending resolution of this appeal, Ungaretti will be forced to disgorge the only payment it has received throughout the course of over three years of representing the Bankruptcy Trustee. Ungaretti will have received no payment whatsoever despite having rendered valuable services and incurred costs which have provided a substantial benefit to the bankruptcy estate. Absent a stay pending resolution of this appeal, Ungaretti will be left without any financial recourse whatsoever. In the event no stay is imposed pending appeal, the disgorged funds will likely be used to satisfy Chapter 7 fees, further compounding the irreparable injury to Ungaretti. If the disgorged funds are used to satisfy Chapter 7 fees and Ungaretti succeeds in this appeal, it will have no way of recovering any of the fees and expenses disgorged.

<b><u>A Stay Will Not Render Substantial Harm to Other Parties in the Litigation</u></b>

11.    Ungaretti is a well-established, well respected law firm which is comprised of over one hundred attorneys. Ungaretti has budgeted the disgorgement sum as a line item in its financials. Accordingly, a stay of the Disgorgement Order pending resolution of this appeal will not render substantial harm to the other parties since funds will be available for disbursement should the District Court not rule in favor of Ungaretti.

## A Stay of the Disgorgement Order Pending Resolution of this Appeal is In the Public Interest

12.     Disgorgement would have a chilling effect on a Chapter 11 bankruptcy trustee's ability to retain counsel thereby hindering the ability to maximize the return for all creditors involved since counsel would be reluctant to engage in representation knowing that he may not be compensated if the case is converted to a Chapter 7 and may even further risk foregoing all costs advanced in the representation. In re Chute, 235 B.R. 700, 702 (Bankr. E.D. Mass 1999)(holding that disgorgement of contingency fee and costs is inequitable and might have a chilling effect on trustee's ability to retain special counsel in the future where counsel stated that he would never have accepted the position of special counsel if the trustee revealed that there was a chance he would be denied a major part of his fee, even if successful). Accordingly, a stay of the Disgorgement Order pending this appeal, which is likely to succeed on the merits, without which Ungaretti will suffer irreparable harm and which will not render substantial harm to the other parties to this litigation, is in the public interest and should be granted.

WHEREFORE, Ungaretti & Harris, LLP, Appellant herein, requests the entry of an Order staying the Disgorgement Order pending resolution of the appeal and for any other and further relief this Court deems appropriate.

Respectfully submitted,

UNGARETTI & HARRIS, LLP

_____ /s/Bruce L. Wald _____
One of its Attorneys

Bruce L. Wald (ARDC No.2919095)
Jeffrey B. Rose (ARDC No.6186133)
Natalia K. Rzepka (ARDC No. 6278368)
TISHLER & WALD, LTD.
200 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 876-3800

# EXHIBIT F

## Apostolides, George P.

**From:** USBC_ILNB@ilnb.uscourts.gov
**Sent:** Tuesday, July 15, 2008 3:09 PM
**To:** CourtMail@ilnb.uscourts.gov
**Subject:** Ch-7 ERW 99-35434 Resource Technology Corporation Order on Motion To Stay Pending Appeal

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. Bankruptcy Court

### Northern District of Illinois

Notice of Electronic Filing

The following transaction was received from Pruitt, Debra entered on 7/15/2008 at 3:09 PM CDT and filed on 7/15/2008

**Case Name:**        Resource Technology Corporation
**Case Number:**       99-35434
**Document Number:** 4333

**Docket Text:**
(E)Order Denying for the Reasons Stated on the Record Motion To Stay Pending Appeal. (Related Doc # [4327]) . Signed on 7/15/2008. (Pruitt, Debra)

The following document(s) are associated with this transaction:

**99-35434 Notice will be electronically mailed to:**

Allan V. Abinoja    aabinoja@novackandmacey.com

Mark E. Abraham    mabraham@gouldratner.com

R Scott Alsterda    rsalsterda@uhlaw.com, ralsterda@ecf.epiqsystems.com

Andrew J. Annes    aannes@sabt.com

George P Apostolides    gpapostolides@arnstein.com

William J. Barrett    william.barrett@bfkn.com

Marc O. Beem    mbeem@millershakman.com,
mpadilla@millershakman.com;tlawhead@millershakman.com

Joseph P. Berglund    berglundniew@aol.com

Louis D Bernstein    lbernstein@muchshelist.com, ccafcules@muchshelist.com

David C. Bohan    dbohan@reedsmith.com

Erich S Buck    ebuck@reedsmith.com

Nicole L. Castillo    ncastillo@nealandleroy.com

Barry A Chatz    bachatz@arnstein.com

Christine L Childers    cchilders@jenner.com, docketing@jenner.com

Joseph E Cohen    jcohenattorney@aol.com, jcohen@cohenandkrol.com;;mom4sbcheerdance@aol.com

Tracey A Dillon    tadillon@enviroatty.com

Faith Dolgin    faith.dolgin@illinois.gov

William J Factor    wfactor@seyfarth.com

Patricia J Fokuo    pfokuo@schiffhardin.com, edocket@schiffhardin.com

Robert P Follmer    ostlingassociates@comcast.net

Eugene J Geekie    egeekie@schiffhardin.com

Arlene N Gelman    agelman@vedderprice.com

Kathryn Gleason    USTPRegion11.es.ecf@usdoj.gov, Kathryn.M.Gleason@usdoj.gov

Thomas W. Goedert    tgoedert@nealandleroy.com

Cameron H Goodman    cgoodman@smbtrials.com, goodman.c@comcast.net

Geoffrey S. Goodman    ggoodman@foley.com, egreen@foley.com;khall@foley.com

Christopher J Grant    cgrant@atg.state.il.us

Steve Jakubowski    sjakubowski@colemanlawfirm.com

Gregory J Jordan    gjordan@polsinelli.com

Joseph P Kincaid    jkincaid@smbtrials.com

Diane F. Klotnia    dklotnia@millershakman.com

Linda M Kujaca    lkujaca@aol.com

Mark E Leipold    mleipold@gouldratner.com, stamssot@gouldratner.com;hmartinez@gouldratner.com

7/27/2008

Joy E Levy    jelevy@arnstein.com, jelevy@arnstein.com

Ryan Liska    rliska@theniewgroup.com

Sara E Lorber    slorber@seyfarth.com

Mitchell L. Marinello    mmarinello@novackandmacey.com, djenkins@novackandmacey.com

Richard J Mason    rmason@mcguirewoods.com,
docket@mcguirewoods.com;cgunderson@mcguirewoods.com;jbrehm@mcguirewoods.com

Kelly J McClintic    kmcclintic@keatingshure.com, kkeating@keatingshure.com

William J McKenna    wmckenna@foley.com, khall@foley.com

Colleen E McManus    cmcmanus@muchshelist.com

Gerald F. Munitz    gerald.munitz@goldbergkohn.com

William T Neary    USTPRegion11.ES.ECF@usdoj.gov

Norman B Newman    nnewman@muchshelist.com

Michelle G Novick    mnovick@fagelhaber.com

Kathryn A Pamenter    kathryn.pamenter@goldbergkohn.com

Michael C. Partee    mpartee@atg.state.il.us

Nancy A Peterman    petermann@gtlaw.com,
carlsonk@gtlaw.com;greenbergc@gtlaw.com;ostrowe@gtlaw.com;lowena@gtlaw.com;bloomw@gtlaw.

Ann E Pille    ann.pille@dlapiper.com, apille@reedsmith.com

Alex Pirogovsky    apirogovsky@uhlaw.com

Christopher H Purcell    shermlaw13@aol.com

Dennis E. Quaid    dquaid@tcfhlaw.com

Craig E. Reimer    creimer@mayerbrown.com

Christopher L. Rexroat    clrexroat@uhlaw.com

Charles S Riecke    criecke@seyfarth.com

Mark D. Roth    roth.mark@sbcglobal.net

Natalia K. Rzepka    nrzepka@tishlerandwald.com

7/27/2008

Michael M Schmahl    mschmahl@mcguirewoods.com,
docket@mcguirewoods.com;cgunderson@mcguirewoods.com

Peter J Schmidt    pschmidt@polsinelli.com

Mayer Y Silber    mayer.y.silber@irscounsel.treas.gov

Patricia K. Smoots    psmoots@mcguirewoods.com

Miriam R. Stein    mrstein@arnstein.com

Jay A Steinberg    jsteinberg@foley.com,
jsteinberg@ecf.epiqsystems.com;jbmedziak@arnstein.com;blsutton@arnstein.com

Robert D Tepper    rtepper@sabt.com

Susan Valentine    svalentine@robinsoncurley.com

Jon C Vigano    jvigano@schiffhardin.com, edocket@schiffhardin.com;dgordon@schiffhardin.com

Bruce L Wald    bwald@tishlerandwald.com

Collin B Williams    williamsco@gtlaw.com

Thomas C. Wolford    twolford@ngelaw.com, jhampton@ngelaw.com

Peter J Young    pyoung@winston.com

**99-35434 Notice will not be electronically mailed to:**

William J Anaya
,

George P Apostolides
,

Arnstein & Lehr LLP
120 S. Riverside Plaza
Chicago, IL 60606

Arnstein & Lehr, LLP
,

William WP Atkins
Atty for City/County Landfill Committee
Peoria County Courthouse
324 Main Street Room 111
Peoria, IL 61602

Mary Bacon
,

7/27/2008

Bagby & Russell Electric Co
,

Michael Baird
,

William J Barrett
Gardner Carton & Douglas
191 N Wacker Drive Suite 3700
Chicago, IL 60606-1698

Thomas F Blakemore
,

Michael S Blazer
Jeep & Blazer LLC
24 N Hillside Avenue
Suite A
Hillside, IL 60162

Eric E Boyd
,

Mark Brand
Sachnoff & Weaver Ltd
10 S Wacker Drive
Chicago, IL 60606-7507

Kerry Carlson
,

Kathleen Holper Champagne
,

Barry A Chatz
,

Ezra H Cohen
,

Philip L Comella
Seyfarth & Shaw
55 E Monroe Suite 4200
Chicago, IL 60603

John Connelly
c/o Gould & Ratner
Attn: Louis D. Bernstein
222 N. LaSalle Street
8th Floor

7/27/2008

Chicago, IL 60601

Jack Dowden

,

Environ International Corp

,

Ewing Bemiss & Co

,

Susan G Feibus

,

David E Finck

,

David J Fischer
Wildman Harrold Allen & Dixon
225 W Wacker Dr Ste 3000
Chicago, IL 60606

Robert M Fishman
1144 West Fulton St #200
Chicago, IL 60607

Patricia Jo Forkuo
Schiff Hardin
6600 Sears Tower
Chicago, IL 60606

Joseph A Friedman
Kane Russell Coleman & Logan
3700 Thanksgiving Tower/1601 Elm St
Dallas, TX 75201

Brian M Graham
Shaw Gussis Fishman Glantz Wolfson et al
1144 West Fulton Street Ste 200
Chicago, IL 60607

Theodore E Harman
Ungaretti & Harris
3500 Three First National Plaza
Chicago, IL 60602

Hawkey & Kline Coring & Drilling, Inc.
c/o Cohen & Krol
105 W. Madison
Suite 1100
Chicago, IL 60602

7/27/2008

High Ridge Partners Inc
,

Frank W Ierulli
,

Kane Russell Coleman & Logan, P.C.
,

David E Lierberman
,

Loop Properties
,

Lisa Madigan
Attorney General Illinois
160 N LaSalle St Ste N-1000
Chicago, IL

James T Markus
,

Susan C Mathews
,

Melissa G. Melsher
Ungaretti & Harris LLP
3500 Three First National Plaza
Chicago, IL 60602

Kristin T Mihelic
Fagelhaver Llc
55 E Monroe St Suite 4000
Chicago, IL 60603

Steven A Miller
,

Miller Shakman Hamilton
,

Alex D Moglia
,

Kent E Mohr Jr
Jeep & Blazer LLC
24 N Hillside Ave
Suite A
Hillside, IL 60162

7/27/2008

Michelle Murphy
,

James D Newbold
100 W Randolph
Chicago, IL 60601

Karen V Newbury
Jenner & Block Llc
One Imb Plaza
Chicago, IL 60611

Stanley E Niew
Niew & Assoc
900 Jorie Blvd #122
Oakbrook, IL 60521

Northern Illinois Gas Company
,

Alex Pirogovsky
,

Popowcer Katten Ltd
Popowcer Katten Ltd
35 E Wacker Dr, Ste 902
Chicago, IL 60601

Christopher L Rexroat
,

James Richmond
Greenberg Traurig LLP
77 W. Wacker Drive
Chicago, IL 60601

Robinson Curley & Clayton, PC
,

Micheal L Shakman
Miller Shakman & Hamilton
180 N Lasalle St
Suite 3600
Chicago, IL 60601

Brian L Shaw
Shaw Gusis Domanskis Et Al
1144 W Fulton Ste 200
Chicago, IL 60607

7/27/2008

Jennifer E. Smiley
Miller, Shakman & Hamilton
180 N. LaSalle Street
Suite 3600
Chicago, IL 60601
jsmiley@millershakman.com

Lawrence N Stein
20 N Clark
Suite 1725
Chicago, IL 60602

Miriam R Stein
,

The Official Committee of Unsecured Creditors
,

Pia N Thompson
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606
pthompson@reedsmith.com,
cwilson@reedsmith.com;;mleib@reedsmith.com;smckessy@reedsmith.com;kpreuss@reedsmith.com

Frederick E Vars
Miller Sharkman & Hamilton
180 N LaSalle St, Ste 3600
Chicago, IL 60601

Jon C Vigano
D'ancona & Pflaum Llc
111 East Wacker Drive Suite 2800
Chicago, IL 60601

Greta G Weathersby
77 W Wacker Drive
Suite 4400
Chicago, IL 60601

Adam Wenner
Chadbourne & Parke LLP
,

Lois West
Popowcer Katten Ltd
,

Lois West
Popowcer Katten Ltd
35 E Wacker Dr, Suite 902

7/27/2008

Chicago, Il 60601

Michael D Wexler
Seyfarth Shaw
55 E Monroe Ste 4200
Chicago, IL 60603

Connie Windhof

,

Harris Winsberg
Troutman Sanders LLP
600 Bank of America Plaza - Suite 5200
Atlanta, GA 30308

Harris B Winsberg

,

Joshua W Wolfshohl
Porter & Hedges LLP
1000 Main Street
3600
Houston, TX 77002

John F Young
1700 Lincoln Street Ste 4000
Denver, Co 80203

Peter D Young

,

David E lieberman

,

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| Resource Technology Corporation, | ) | Case No. 99-35434 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |

### UNGARETTI & HARRIS LLP'S RESPONSE IN OPPOSITION TO CHAPTER 7 TRUSTEE'S MOTION FOR ORDER DIRECTING DISGORGEMENT OF FEES

For a variety of reasons, this Court should deny the Chapter 7 Trustee's Motion for Order Directing Disgorgement of Fees (the "Motion"). First, the Motion is premature; the Chapter 7 Estate is not administratively insolvent. Moreover, Ungaretti & Harris LLP's ("U&H") appeal from this Court's order granting the Chapter 7 Trustee's motion for judgment on the pleadings in U&H's related adversary proceeding against the Chapter 7 Trustee, which involves issues related to those raised in the Motion (the "Appeal"), is currently pending in the District Court. The Court should refrain from ruling on the Motion until the District Court decides the Appeal. Finally, if the Court grants the Motion, Ungaretti & Harris LLP ("U&H") would be prejudiced vis-à-vis other Chapter 11 creditors who received full or partial payment of their Chapter 11 administrative claims in violation of 11 U.S.C. §726(b).[1]

### PERTINENT FACTS

On August 19, 2003 the Court entered an order approving the appointment of a Chapter 11 Trustee. On August 25, 2003, the United States Trustee filed an Application to approve

---

[1] The Chapter 7 Trustee also argues that U&H's failure to comply with the Fee Procedures Order entered on September 18, 2003, should result in U&H's disgorgement of the fees it received. Even if U&H failed to follow the Fee Procedures Order, the drastic remedy of disgorgement would not be justified. U&H performed services on behalf of the Chapter 11 Estate, the payments it received were far lower than the payments to which the Fee Procedures Order entitled U&H, and U&H filed a fee petition, which is currently pending and is subject to the Court's review.

the appointment of Gregg E. Szilagyi as the Chapter 11 Trustee.  On August 26, 2003, the Court entered an order approving the appointment of Gregg E. Szilagyi as Chapter 11 Trustee.  On August 28, 2003, the Court entered an Order authorizing the Trustee to retain U&H as his legal counsel *nunc pro tunc* to August 22, 2003.  On September 18, 2003, the Court entered an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Trustee's Professionals (the "Fee Procedures Order").

Pursuant to the Fee Procedures Order, U&H circulated its monthly invoices for the months of September 2003 through April 2005 to the designated creditors and parties in interest.  No party objected to any of U&H's bills or interim payments under the Fee Procedures Order.  From time to time, the secured lender with respect to the Debtor's facility at Pontiac, Illinois – "Aquila" – authorized the Chapter 11 Trustee to use its cash collateral generated from operations at the Pontiac facility to make payments to U&H under the Fee Procedures Order.  These payments are as follows:

| DATE | AMOUNT | CHECK # |
|---|---|---|
| 11/25/2003 | $15,000.00 | 2123 |
| 1/13/2004 | $15,000.00 | 2201 |
| 1/28/04 | $15,000.00 | 2234 |
| 3/24/04 | $15,000.00 | 2308 |
| 4/22/2004 | $30,000.00 | 2352 |
| 5/21/2004 | $30,000.00 | 2381 |
| 6/23/2004 | $30,000.00 | 2420 |
| 7/24/2004 | $30,000.00 | 2480 |
| 8/31/2004 | $30,000.00 | 2552 |
| 9/30/2004 | $30,000.00 | 2624 |
| 11/22/2004 | $25,000.00 | Wire |
| 12/22/2004 | $25,000.00 | Wire |
| 1/28/2005 | $25,000.00 | Wire |
| 3/9/2005 | $25,000.00 | Wire |
| 3/22/2005 | $25,000.00 | Wire |
| 5/5/2005 | $11,235.54 | Wire |
| **TOTAL:** | **$376,235.54** | |

The payments made to U&H from Aquila's cash collateral were significantly less than the Fee Procedures Order allowed U&H to receive, to which higher amount no creditor objected. The Chapter 7 Trustee now seeks the disgorgement of these payments made to U&H.[2] For the reasons stated herein, the Court should deny the Motion.[3]

## ARGUMENT

### I.　　The Motion is premature.

First, disgorgement is a viable remedy only when a bankruptcy estate is administratively insolvent. *See In re Kids Creek Partners, L.P.*, 219 B.R. 1020, 1022 (Bankr N.D. Ill. 1998) (*citing Matz v.Hoseman*, 197 B.R. 635 (Bankr. N.D. Ill. 1996)). In this case, the Trustee admits that the Chapter 7 estate is not administratively insolvent. *See* MOTION, ¶¶10 and 11 and fn. 3. Where the estate is not administratively insolvent, there are no grounds for the Court to order disgorgement.

Second, the Court should withhold from ruling on the Motion until after the District Court decides the Appeal. The Appeal has been fully briefed and is awaiting the District Court's ruling. The Appeal involves both the proposed settlement agreement between the Chapter 7 Trustee and U&H, which this Court refused to allow, and this Court's order granting the Chapter 7 Trustee's motion for judgment on the pleadings in U&H's related adversary proceeding against the Chapter 7 Trustee. The matters on appeal directly involve the payments made to U&H and additional monies sought from the bankruptcy estate by

---

[2] The Chapter 7 Trustee does not state a valid basis for the relief he seeks in the Motion. 11 U.S.C. §726 sets forth priorities; it does not allow disgorgement of Chapter 11 payments. And, standing alone, §105 does not confer power on the Bankruptcy Court to fashion relief not allowed by the Bankruptcy Code. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); *In re Kmart Corp.*, 359 F.3d 886 (7th Cir. 2004).

[3] Because the Motion seeks "to recover money or property" from U&H, the Chapter 7 Trustee may be required to bring an adversary proceeding pursuant to FED. R. BANKR. P. 7001.

U&H. If the District Court rules in favor of U&H, then the status of the fees it seeks and the fees it has already received may change, altering or mooting the Motion.

In order to maintain consistency in ruling on and treatment of the U&H fee issues in this case and in order to conserve judicial resources, the Court should withhold from ruling on the Motion until the Appeal is decided. There is no prejudice to the Chapter 7 Trustee or the estate's creditors in the Court's taking up the Motion at a later date. *Cf. In re Kids Creek Partners, L.P.*, 236 B.R. 871, 873 (Bankr. N.D. Ill. 1999) (where the Court (i) ruled on a disgorgement motion but made it interlocutory and stated that the ruling may be revisited based on the outcomes of pending appeals, and (ii) did not require payment until after those appeals were determined, subject to the outcomes of those appeals.).

## II.    Disgorgement would prejudice U&H and violate 11 U.S.C. §726(b).

Between January 18, 2000 and September 21, 2005, this case was a Chapter 11 case. During those nearly six years, numerous professionals and other creditors received payments for administrative services they provided to the estate, among them Debtor's counsel and certain financial and accounting professionals on behalf of the Debtor. As the Chapter 7 Trustee notes in the Motion, 11 U.S.C. §726(b) provides for the pro rata distribution of assets among creditors in the same statutory class. The relief the Chapter 7 Trustee seeks in the Motion would violate this section to the extent other Chapter 11 professionals and trade creditors were allowed to retain the payments they received on account of their respective Chapter 11 claims.

U&H, which provided valuable services to the bankruptcy estate and its creditors for approximately three years, would be the only Chapter 11 administrative creditor receiving nothing on account of its Chapter 11 administrative claim, while other Chapter 11 administrative creditors would be allowed to retain what they received on account of theirs.

Thus, while the Chapter 7 Trustee claims to bring the Motion in order to keep the bankruptcy estate in line with the distribution priorities of the United States Bankruptcy Code (the "Code"), in fact the relief he seeks, if granted, would violate the Code. As the Court in *In re Anolik*, noted:

> Where disgorgement by any party is ordered, such disgorgement should not exceed the amount that would be required to achieve a pro rata distribution assuming that all parties subject to disgorgement were ordered to relinquish funds, regardless of whether the court actually so ordered. A claimant required to disgorge should not suffer disproportionately simply because the court equitably waived disgorgement for another administrative claimant.

207 B.R. 34, 40 (Bankr. D. Mass. 1997); and "Court authorized professionals are not second-class service providers, nor does their function include the disproportionate subsidization of bankruptcy cases." *Id.* at fn.10.

Given the current financial state of the Chapter 7 estate, the dollar amount of Chapter 11 administrative payments made, and the number and identity of creditors receiving such payments, it is impossible to determine whether the estate is administratively insolvent,[4] and even if it is, it is impossible to determine the amount which each creditor receiving a payment on its Chapter 11 claim would need to disgorge in order to put all such similarly situated creditors on equal footing vis-à-vis their respective Chapter 11 administrative claims.

Additionally, the premise that forms the basis for the Motion is erroneous. The Chapter 7 Trustee appears to argue that the Chapter 7 Estate is administratively insolvent, and therefore, U&H should disgorge the payments it received on its Chapter 11 claims. The error in that argument is that where the Chapter 7 Estate is administratively insolvent, and

---

[4] For instance, a final order has been entered on the Chapter 7 Trustee's fees to date; the Chapter 7 Trustee's fees and fees of his counsel are still subject to review. Moreover, U&H's final fee application has been pending, and U&H has been awaiting a hearing on its final fee application for a year and a half. The hearing on U&H's final fee application has been continued at the request of the Chapter 7 Trustee on the basis that he did not know whether there would be a distribution on Chapter 11 administrative claims.

certain Chapter 7 creditors received payment and others did not, or certain Chapter 7 creditors received disproportionate payments vis-à-vis other Chapter 7 creditors, the Chapter 7 Trustee should, in the first instance, seek disgorgement, if at all, from Chapter 7 creditors who received payment, then redistribute those funds equally among Chapter 7 creditors before moving to a different class of creditors. *See Kids Creek*, 219 B.R. 1020; *Anolik*, 207 B.R. 34. Because, as discussed above, the Motion is premature, and the financial status of the Chapter 7 Estate is unknown, the Chapter 7 Trustee is unlikely to be able to make the necessary calculations and determinations as to whether such actions would be proper.

As the Chapter 7 Trustee noted, ordering disgorgement is within the Court's discretion. However, the Chapter 7 Trustee has not shown the compelling circumstances required by the *Kids Creek* court to warrant exercise of such discretion. *See Kids Creek*, 236 B.R. at 875.

For all of the foregoing reasons, the Court should deny the Motion.

Dated: July 3, 2007

Respectfully submitted,

UNGARETTI & HARRIS LLP

By:_____Alex Pirogovsky_____
One of its attorneys

R. Scott Alsterda (ARDC No. 3126771)
Alex Pirogovsky (ARDC No. 6256978)
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone: 312.977.4400
Facsimile: 312.977.4405

931999-1                          6